**WARDS COMPANY, INC.,**
**Plaintiff-Appellee,**

v.

**STAMFORD RIDGEWAY ASSOCIATES**
**and Trim Fashions, Inc., Defendants,**

**Stamford Ridgeway Associates,**
**Defendant-Appellant.**

**No. 896, Docket 84–9004.**

United States Court of Appeals,
Second Circuit.

Argued March 14, 1985.
Decided May 3, 1985.

David M. Cohen, Stamford, Conn. (Wofsey Rosen Kweskin & Kuriansky, Stamford, Conn., Stephen A. Finn, Stamford, Conn., on brief), for defendant-appellant.

Gregory W. Nye, Hartford, Conn. (Hebb & Gitlin, Hartford, Conn., Alan Robert Baker, Hartford, Conn., of counsel), for plaintiff-appellee.

Before KAUFMAN and CARDAMONE, Circuit Judges, and TENNEY, District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

At its best, the written word provides an excellent means of communicating information. At its worst, language can obfuscate the very meaning sought to be conveyed. In the hands of some lawyers, it seems, words tend more often to confuse than clarify simply thoughts. Alas, this is nothing new. The insightful (if fictitious) Lemuel Gulliver, in describing the profession of law, explained: "There was a society of men among us, bred up from their youth in the act of proving, by words multiplied for the purpose, that white is black and black is white." J. Swift, *Gullivers Travels: Houghnhnms*, ch. 5.

Today, we are again called upon to dissect the work of an unknown draftsman, and to decide whether a certain contractual term is "wholly unambiguous" within the meaning of *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). Because that task requires some familiarity with the broader transaction, we set forth the relevant facts before turning to the ultimate legal issue.

---

* The Honorable Charles H. Tenney, United States District Judge for the Southern District of New York, sitting by designation.

## I. Background

The Ridgeway Shopping Center, located in Stamford, Connecticut, is owned by appellant Stamford Ridgeway Associates ("Ridgeway"), a partnership organized under the laws of the State of New York. In 1972, Ridgeway's predecessor leased premises in the shopping center to Lafayette Radio Electronics of Stamford, Inc. ("Lafayette") for use as a retail electronics store. The lease covered an initial sixteen-year term, together with two five-year option periods. Pursuant to its terms, Lafayette was obligated to pay Ridgeway $26,900 annually in fixed rent until June 1988. Thereafter, it was to pay annual fixed rent of $29,235 and $31,400, respectively, during each of the two five-year option periods.

In January 1980, Lafayette filed a petition with the United States Bankruptcy Court for reorganization pursuant to Chapter 11 of the Bankruptcy Code. Under the court's supervision, Lafayette continued to operate as debtor-in-possession. In April, John Winter, Ridgeway's General Manager, approached Robert Crimmins, Lafayette's director of real estate. He inquired whether Lafayette would be willing to assign its interest in the lease to Trim Fashions, Inc., another tenant in the shopping center that had expressed a desire to occupy Lafayette's premises. Rather than sell its interest outright, Lafayette proposed to sublet the space to Trim Fashions. After a period of negotiation between the two retailers, a sublease was conditionally executed in June 1980. Immediately thereafter, the document, which was conditioned upon the consent of the lessor, was delivered to Ridgeway, and on July 9, 1980, Ridgeway executed its consent.

Under the terms of the sublease, Lafayette was to receive fixed minimum rent of $55,680 annually during the base term of the prime lease, increasing to $78,880 annually and $102,080, respectively, during each of the two five-year option periods. Accordingly, Lafayette, as lessee under the prime lease and lessor under the sublease, was to profit in the amount of the differential between the fixed minimum rents provided by those documents, i.e., $26,926 annually through July 1988, and $45,950 annually and $68,990 annually, respectively, during the two five-year option periods.

In August 1980, the Bankruptcy Court authorized Lafayette to assume the prime lease and approved the executed sublease. On September 1, 1980, the sublease term commenced and Trim Fashions began payment to Lafayette of fixed minimum rent at the rate of $55,680 annually. Lafayette continued to pay Rideway the rent due under the prime lease, i.e., $26,900 annually.

In June 1981, Lafayette was merged into Wards Company, Inc. ("Wards"), which assumed possession of Lafayette's assets and liabilities—including its interests in the prime lease and sublease. Subsequent to the merger Trim Fashions continued to pay Wards the rent due under the sublease, and Wards continued to pay Ridgeway the rent due under the prime lease. Wards, of course, retained the rent differential of $26,926 per year.

On August 13, 1982, Ridgeway first made demand upon Wards for one-half of the accrued rent differential for the period from September 1980 (when the sublease term commenced). Ridgeway's demand, which forms the basis of the instant dispute, was premised upon paragraph 52(c) of the prime lease ("paragraph 52(c)"). That provision, reprinted *infra* at pp. 120–121, sets forth the rights of the parties in the event the premises are sublet.

After making its demand, Ridgeway threatened legal action to terminate the lease for nonpayment of one-half of the differential. To avoid a possible forfeiture of the lease, Wards agreed—conditionally and under protest—to pay Ridgeway the sum of $32,377.59 (representing the arrearages since September 1980 as calculated by Ridgeway) plus one-half of the differential each month. Wards then commenced this action in the United States District Court for the District of Connecticut, seeking a declaratory judgment determining whether one-half of the rent differential is indeed owed to Ridgeway pursuant to paragraph

52(c).[1] After Ridgeway filed its answer, Wards moved for summary judgment pursuant to Fed.R.Civ.P. 56. Following the filing of pleadings and completion and completion of limited discovery, the motion was argued before Judge Burns. In August 1984, the district court granted the motion, finding that the terms of paragraph 52(c) were "wholly unambiguous" within the meaning of this Court's holding in *Heyman, supra,* 524 F.2d at 1320, and that Wards was not obligated to remit any part of the rent differential to Ridgeway pursuant to that paragraph. Judgment was entered, and Ridgeway appealed.

## II. DISCUSSION

■ The standards for granting summary judgment are sufficiently clear in this Circuit that we need spend little time reiterating them. In an action on a contract—such as the one before us—summary judgment is perforce improper unless the terms of the agreement are "wholly unambiguous." *Heyman, supra,* 524 F.2d at 1320; *see Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 (2d Cir.1983). This standard comports with the scheme propounded by the drafters of the Federal Rules of Civil Procedure. *See* Kaplan, *Amendments of the Federal Rules of Civil Procedure, 1961–63 (II),* 77 Harv.L.Rev. 801, 825–28 (1964). Focusing on the language of Rule 56, we have held that "the key is issue-finding, not issue-resolution." *United States v. One Tintoretto Painting Entitled "The Holy Family with Saint Catherine and Honored Donor",* 691 F.2d 603, 606 (2d Cir.1982). Accordingly, unless the moving party can establish tht contractual language is not "susceptible of at least two fairly reasonable meanings," *Schering, supra,* 712 F.2d at 9, a material issue exists concerning the parties' intent, and the non-moving party has a right to present extrinsic evidence regarding the meaning of the contested term. *See Heyman, supra,* 524 F.2d at 1320; *Home Ins. Co. v. Aetna Casualty & Surety Co.,* 528 F.2d 1388, 1390 (2d Cir.1976).

■ We stress that the meaning urged by the non-moving party must be "fairly reasonable," for, indeed, it is the rare sentence that cannot be read in more than one way if the reader is willing either to suspend the rules of common English usage or ignore the conventions of a given commercial setting. "A Court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." *Downs v. National Casualty Co.,* 146 Conn. 490, 494, 152 A.2d 316, 319 (1959). Contorted semanticism must not be permitted to create an issue where none exists. Yet, where the text of an agreement reasonably allows for varying interpretations—whether by the inadvertence or design of the draftsman—the need for judicial construction cannot, and may not, be avoided. *Grand Union Co. v. Cord Meyer Development Corp.,* 735 F.2d 714, 717 (2d Cir.1984); *see Schering, supra,* 712 F.2d at 9.

■ With these principles firmly in mind, we turn to examine paragraph 52(c) of the prime lease. Because our discussion is meaningful only by reference to its precise language, we set forth the paragraph in its entirety:

> (c) In the event Lessee wishes to sublet the demised premises, Lessee shall give Lessor written notice thereof and Lessor shall have the right for a period of sixty (60) days thereafter to recapture possession of the demised premises and cancel this lease by giving notice to said effect to Lessee within said 60-day period. In the event Lessor shall give such notice of recapture Lessee shall have a period 60 days thereafter to vacate and surrender and Lessee agrees that in the event of election

---

1. Wards also sought a declaratory judgment in the district court to determine if one-half the rent differential was in fact owed by Wards to Ridgeway, whether the same amount is due Wards from Trim Fashions under the terms of the sublease. That issue is not before us on appeal.

by Lessor to recapture as aforesaid Lessee will pay the rent required to be paid under the terms of this lease to the date of Lessee's removal and thereafter Lessee shall have no further liability under this lease.

In the event Lessor shall not exercise said right of recapture Lessee shall have the right, without the consent of Lessor, to sublet the whole of the demised premises provided the following conditions are met:

(1) The proposed use of the demised premises (i) is not harmful or deleterious to the Shopping Center, (ii) is in keeping with the character of the other retail businesses being conducted therein, and (iii) does not conflict with any exclusive use granted to any other tenant or with any business then being conducted in the Shopping Center.

(2) If the amount of fixed rent payable under the sublease shall exceed the amount of fixed rent payable hereunder one-half (½) of the excess shall be paid by Lessee to Lessor in addition to the fixed rent payments payable hereunder as additional rent.

(3) If the proposed use shall be different than the use permitted herein the percentage of gross sales for computing percentage rent hereunder (to wit, 2%) shall be changed to that percentage which is suggested by the Real Estate Board of New York for the type of business of the proposed lessee.

(4) A duplicate original of the sublease shall be sent to Lessor within ten (10) days after execution and delivery thereof.

Lessee agrees that it will not advertise to sublet the demised premises at a rate which is lower than that then being quoted by Lessor for vacant space in the Shopping Center.

The first paragraph of the quoted language creates a right in favor of Ridgeway to recapture the premises upon learning of Lafayette's wish to sublet. Ridgeway did not elect to exercise this right and, indeed, waived it by consenting to the sublease.

*See Newfield Building Co. v. Mohican Co.*, 105 Conn. 488, 136 A. 78 (1927). Accordingly, the "in the event ..." clause that begins the second paragraph—a condition precedent to the operation of the remainder of the entire section—is fulfilled. We are left, then, with only the following pertinent language:

Lessee shall have the right, *without the consent of Lessor,* to sublet ... provided, ... one-half of the [rent differential] shall be paid by Lessee to Lessor in addition to the fixed rent.... (emphasis added)

In moving for summary judgment, Wards claimed paragraph 52(c) unambiguously provides that the extra rent provision applies only where the lessee sublets without the consent of the lessor. By contrast, Ridgeway argued that the term's "plain meaning" is such that the lessee may sublet—with or without the lessor's consent—but that the enumerated conditions (including extra rent) apply in every subleasing situation. In adopting Wards's construction and finding the language of paragraph 52(c) "unambiguous," the district court impliedly held that Ridgeway's "construction" was not "fairly reasonable." *Schering, supra,* 712 F.2d at 9. We disagree.

In essence, this dispute may be restated as follows: Does "without the consent of Lessor" modify "shall have the right" (as urged by Ridgeway) or "provided the following conditions are met" (as Wards contends)? In reviewing the district court's grant of summary judgment, we need not determine which is the more likely interpretation; we need merely decide whether the former, which was rejected below, is sufficiently reasonable to render the clause ambiguous within the meaning of *Heyman, supra.*

It is worth noting that Judge Burns construed "the words 'without consent' [as] modifying the right to sublet," although she went on to write that the court could not enlarge the phrase to mean "even without" or "with or without." We agree that the consent clause reasonably may be read

to modify "shall have the right," [2] and do not believe such a construction would require the court to rewrite the provision, as, of course, it may not do. *See Collins v. Sears, Roebuck & Co.*, 164 Conn. 369, 321 A.2d 444 (1973).

Under Ridgeway's construction, the lessee's right to sublet merely is not conditioned upon the lessor's consent, (i.e., he may sublet "without the consent of Lessor") but the enumerated conditions must be met. Such a reading, although it may not *in fact* reflect the intent of the parties, is certainly "reasonable." If the lessor and lessee intended to provide that one should have the right to do something irrespective of the wishes of the other, it might reasonably be thought that the "without consent" language would effectuate that arrangement. The parties might well have thought it self-evident that the lessee could sublet *with* the lessor's consent (subject to conditions 1–4)—indeed, who else could object?

Very simply, we cannot say that the construction urged by Ridgeway is not a "fairly reasonable" one under the circumstances. Accordingly, we need not address the merits of the dispute, or attempt to determine which interpretation is more reasonable, however persuasive the arguments on appeal.[3] Indeed, we are ill-equipped to hazard anything more than an educated guess on the question. The trial court may wish to inquire into, *inter alia,* the circumstances surrounding the sublet clause's negotiation and drafting, the identity of the drafter, custom in the trade, or any other evidence it deems probative on the issue of

the parties' intent at the time the lease was drafted and executed.

We have no doubt that the decision of the district court evidenced no more than a well-intentioned desire to dispose of a troublesome dispute in an expeditious fashion. In doing so, however, it acted beyond its proper role of identifying a material issue of fact, and instead attempted to resolve that issue.

Accordingly, we reverse the judgment of the district court and remand for further proceedings.

---

**2.** Indeed, a grammarian might suggest that the phrase *ought* to be read as modifying the term immediately adjacent to it in the text, *see* W. Strunk and E. White, *Elements of Style* 24–25 (1968).

**3.** For example, Wards urges that a lessor, before giving consent, may extract specific concessions from a lessee in exchange. Only where such negotiations do not take place, i.e., where there is no consent, are the "pre-arranged" conditions necessary to protect the lessor. Ridgeway counters that such a reading would place the lessor in the anomalous position of being forced to deny permission in order to avail itself of the

enumerated conditions in the lease. Which of these arguments is more persuasive is an issue for trial; neither will defeat a summary judgment motion.

Similarly, we are struck by the fact that Lafayette, by assigning the lease in its entirety, could have retained the then present value of the entire rent-differential. Its choice not to do so may be probative on the issue of its understanding of the sublet clause—or may simply evidence a poor business judgment. Again, this is an issue that may be taken into account by a factfinder. It does not, however, render ambiguous language any more unambiguous.