**ARMOTEK INDUSTRIES, INC.**

v.

**Seymour FREEDMAN, et al.**

**Civ. A. No. H–88–497 (JAC).**

United States District Court,
D. Connecticut.

March 13, 1992.

Ann McClure, Day, Berry & Howard, Hartford, Conn., for plaintiff.

Jeffrey R. Martin, Marie A. Casper, Brenner, Saltzman, Wallman & Goldman, New Haven, Conn., for defendants Seymour Freedman, Helene Freedman and S. Freedman, Inc.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, District Judge:

Pending before the court is the Motion for Summary Judgment (filed Sept. 12, 1991) of defendants Seymour Freedman, Helene Freedman and S. Freedman Electric, Inc., which was submitted for decision after oral argument on January 29, 1992.

### Background

Defendants Seymour Freedman and Helene Freedman are officers and directors of S. Freedman Electric, Inc. ("Electric"). From 1977 through November 1, 1979, Electric owned Chambers–Storck Company ("Chambers–Storck"), which operated a chrome-plating plant in Norwich, Connecticut. On November 1, 1979, Electric sold 100% of the stock of Chambers–Storck to plaintiff Armotek Industries ("Armotek") pursuant to a Stock Purchase Agreement (the "Agreement").

The last sentence of paragraph 3(j) of the Agreement states that Electric "specifically represents and warrants that (Chambers–Storck) is in compliance with all environmental laws, regulations and ordinances and all laws, regulations and ordinances relating to treatment, disposal and removal of liquid, solid and gaseous wastes." In the event any representation or warranty of Electric (the seller) or any document or exhibit provided proves to be untrue or is breached, paragraph 5(a) of the Agreement provides, in part, that Electric will indemnify Armotek (the buyer) for any "losses, costs and expenses sustained by them ... as a result of the untruthfulness or breach...." Finally, paragraph 5(c) of the Agreement bars some claims by plaintiff against defendants if notice of such claims is not given by October 31, 1982. Exactly

what claims are barred is disputed by the parties.

Armotek operated the Chambers–Storck chrome-plating plant from 1979 until 1982. Armotek contends that between 1985 and 1988, pursuant to a directive from the Connecticut Commissioner of Environmental Protection and in cooperation with the Connecticut Department of Environmental Protection ("DEP"), it spent over $35,000 to address, assess and "remediate" contamination at the plant site that allegedly occurred while defendants were operating the chrome-plating plant.

It is undisputed that Armotek did not give Electric (or any other defendant) notice of any claims for indemnification for environmental liabilities until it sent a letter to Electric on March 22, 1985, well over two years after October 31, 1982.[1]

On or about June 23, 1988, Armotek filed a seven-count complaint (the "Complaint") in Connecticut Superior Court against six different defendants, including Seymour Freedman, Helene Freedman and Electric (the "Freedman defendants"), seeking damages for losses, costs or expenses allegedly incurred to assess and remediate alleged environmental contamination at the site of the chrome-plating facility owned by Chambers–Storck. A petition for removal was filed in this court on July 22, 1988.

Count 1 of the Complaint alleges that Electric and Seymour Freedman are liable to plaintiff for the costs of cleanup pursuant to theories that they breached warranties contained in the Agreement. Count 2 alleges that the representations made by Electric and Seymour Freedman constituted fraud. Counts 3 through 7 claim that all of the defendants are liable for losses, costs or expenses incurred by plaintiff in assessing and "remediating" the alleged contamination under the following theories: common law tortious harm to real estate and environment (Count 3); negligence (Count 4); strict liability for abnormally dangerous activity (Count 5); liability pursuant to the environmental statutes of the State of Connecticut, Connecticut General Statutes §§ 22a–451 and 452 (Count 6); and liability pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, et seq. (Count 7).

Defendants argue in their motion that: (1) all of plaintiff's claims are barred because plaintiff failed to provide notice of its claim for indemnification within the time specified by the Agreement; (2) Counts 2 through 6 are barred by the applicable statute of limitations; (3) Count 5 should be dismissed because pollution of ground water and soil is not an ultra-hazardous activity; (4) Count 6 should be dismissed because there is no private right of action under Conn.Gen.Stat. § 22a–451(a); and (5) all claims against Helene Freedman should be dismissed since the undisputed facts fail to demonstrate that she had any involvement in the allegedly unlawful activities.

Plaintiff conceded at oral argument and in its papers that summary judgment is appropriate with respect to some of these counts. First, plaintiff "stipulate[s] to judgment as to Count 1, because it appears that its cause of action did not arise within the contractual period, and Count 2, because it has not established evidence of fraud."[2] Second, with respect to Count 6, plaintiff concedes that there is no private cause of action under Conn.Gen.Stat. § 22a–451. Id. at 19–20, citing The Colonnade One at Old Greenwich Limited Partnership v. Electrolux Corp., 767 F.Supp. 1215, 1219–20 (D.Conn.1991). Accordingly, summary judgment shall enter, absent objection, for defendants and against plaintiff on Counts 1, 2, and that part of Count 6 brought pursuant to Conn. Gen.Stat. § 22a–451.

Plaintiff resists the motion for summary judgment with respect to the remaining

---

1. *See* Plaintiff's Revised Response to Defendant Freedman's Request for Admissions (dated Nov. 2, 1989).

2. Plaintiff Armotek Industries, Inc.'s Memorandum in Opposition to Defendants Seymour Freedman, Helene Freedman and S. Freedman Electric, Inc.'s Motion for Summary Judgment (filed Oct. 31, 1991) ("Plaintiff's Opposition") at 5 n. 1.

counts—that is, Counts 3, 4, 5, that part of Count 6 brought pursuant to Conn.Gen. Stat. § 22a–452, and Count 7. Plaintiff argues that the motion for summary judgment should be denied because: (1) none of the claims are barred for failure to give notice of a claim for indemnification because the time limitation in the indemnification provision of the Agreement only barred contractual causes of action based on defendants' representations and warranties and, at the very least, summary judgment is inappropriate because there is a dispute over the intentions of the parties to the Agreement; (2) there exists a material issue of fact as to when plaintiff discovered that it had a cause of action against defendants with respect to Counts 3 through 5; (3) the limitations period for Count 6 did not begin to run until after Armotek incurred "mitigation expenses;" (4) chromium-plating is an ultra-hazardous activity; and (5) material issues of fact exist as to whether Helene Freedman benefitted from and could have prevented the improper practices which led to the contamination of the property.

### Discussion

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the

motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The non-moving party may defeat the summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Finally, "'mere conclusory allegations or denials'" in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)).

I. *Time Limitation for Notice of Claims in the Agreement*

Defendants contend that each count in the Complaint is barred because paragraph 5(c) of the Agreement requires that plaintiff must have given notice of claims for indemnification of "environmental-type" liabilities by October 31, 1982.[3] In other words, defendants maintain that the parties allocated liability for "conditions existing at the Chamber–Storck site that were unknown to the parties at closing by allocating the risk of the cost of such unknown conditions to the seller [or defendants] for a period of three years from closing and thereafter, to the buyer [or plaintiff]."[4]

Clearly, private parties are allowed to transfer responsibility for environmental liability through indemnification contracts and releases. This is true of environmental liability related to CERCLA as well. By its express terms, section 107(e)(1) of CERC-

---

**3.** *See* Defendants Seymour Freedman, Helene Freedman and S. Freedman Electric, Inc.'s Memorandum of Law in Support of Their Motion for Summary Judgment (filed Sept. 12, 1991) ("Defendants' Memorandum") at 6.

**4.** Reply Memorandum in Support of Defendants' Motion for Summary Judgment (filed Nov. 25, 1991) ("Defendants' Reply") at 15.

LA preserves the right of private parties to contractually transfer to or release another from financial responsibility arising out of CERCLA liability.[5] Although "CERCLA does not allow parties to contract out of liability vis-a-vis the Government, [it] does allow them to do so vis-a-vis other private parties." *Purolator Products Corp. v. Allied–Signal, Inc.*, 772 F.Supp. 124, 129 (W.D.N.Y.1991) (construing section 107(e)(1) of CERCLA and citing, *inter alia, Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1459 (9th Cir.1986)); *Rodenbeck v. Marathon Petroleum Co.*, 742 F.Supp. 1448, 1456 (N.D.Ind.1990) (same). Therefore, the issue before the court is whether any provisions of the Agreement effected a transfer of defendants' CERCLA and other environmental liability to plaintiff after October 31, 1985, so that all counts in the Complaint are barred.

Plaintiff argues that the provisions of the Agreement did not effect a transfer of such liability and that the parties only intended the time limitation in the Agreement to bar contractual causes of action based on defendants' representations and warranties.[6] In any event, plaintiff contends that in order to determine whether the Agreement was meant to transfer environmental liability, the court must consider the intentions of the parties, which is inappropriate on a motion for summary judgment.

It is clear that "[i]n an action on a contract—such as the [Agreement] before [this court]—summary judgment is perforce improper unless the terms of the agreement are 'wholly unambiguous.'" *Wards Co., Inc. v. Stamford Ridgeway Assoc.*, 761 F.2d 117, 120 (2d Cir.1985) (citing *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975) and applying Connecticut law); *see also Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 (2d Cir. 1983). Therefore, "unless the moving par-

ty can establish [that the] contractual language is not 'susceptible of at least two fairly reasonable meanings,' *Schering*, [ ] 712 F.2d at 9, a material issue exists concerning the parties' intent, and the non-moving party has a right to present extrinsic evidence regarding the meaning of the contested term." *Wards Co., Inc.*, 761 F.2d at 120. The meaning urged by the non-moving party, plaintiff in this case, must be "fairly reasonable." *Id.* In short, "[a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." *Id.* (citations and quotation marks omitted); *Barnard v. Barnard*, 214 Conn. 99, 110, 570 A.2d 690 (1990) (same). In sum, this court must (1) examine the provisions of the Agreement, (2) consider the interpretations of those provisions urged by the parties, and (3) decide whether the interpretation urged by plaintiff is "sufficiently reasonable to render the clause ambiguous within the meaning of *Heyman.*" *Wards Co., Inc.*, 761 F.2d at 121. If it is indeed "sufficiently reasonable," then there exists a material issue concerning the parties' intent and summary judgment is inappropriate. *Id.* at 121–22.

### A. Provisions of the Agreement

Three provisions of the Agreement are involved in this dispute: paragraphs 3(j), 5(a) and 5(c). I shall set forth the relevant language of each of these provisions in detail, because a discussion is meaningful only by reference to the precise language of these provisions. *See id.* 120.

#### 1. *Paragraph 3(j)*

The last sentence of paragraph 3(j) of the Agreement states that Electric "specifically represents and warrants that (Chambers–Storck) is in compliance with all envi-

---

**5.** Section 107(e)(1) of CERCLA provides that [n]o indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed in this section. *Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section* (emphasis added).

**6.** *See* Plaintiff's Opposition at 12–13.

ronmental laws, regulations and ordinances and all laws, regulations and ordinances relating to treatment, disposal and removal of liquid, solid and gaseous wastes." There appears to be no dispute as to the meaning of this sentence standing alone.

### 2. *Paragraph 5(a)*

In addition to the representation and warranty included in paragraph 3(j), defendant agreed to include an indemnification provision in paragraph 5(a) of the Agreement, which states, in relevant part, that

[i]n the event *any representation or warranty of Seller made herein,* or any Exhibit hereto or document furnished or to be furnished by Seller in connection with the transactions contemplated herein *proves to be untrue in any respect, or is breached, Seller shall indemnify and hold the Company and Buyer harmless from any losses, costs and expenses sustained by them, or either of them, as a result of the untruthfulness or breach....* (emphasis added).

There also appears to be no dispute as to the meaning of this language. Defendants contend, and plaintiff does not dispute, that the language of paragraph 5(a) provides that defendants agreed to indemnify plaintiff, under certain circumstances,[7] for "losses, costs and expenses" sustained by plaintiff as a result of the untruthfulness or breach "of any representation or warranty made in the Agreement."[8] Indeed, that is the plain meaning of paragraph 5(a).

At least one representation and warranty made in the Agreement is that contained in paragraph 3(j) and quoted above. Therefore, paragraph 5(a) quite simply means

that defendants will indemnify plaintiff for losses, costs and expenses resulting from any representation and warranty in paragraph 3(j) that is "untrue" or is "breached." More specifically, defendants agreed in paragraph 5(a) to indemnify plaintiff for losses, costs and expenses resulting from, for instance, the fact that Chambers–Storck was not actually in compliance with all environmental laws, regulations and ordinances and all laws, regulations and ordinances relating to treatment, disposal and removal of liquid, solid and gaseous wastes at the time the Agreement was made.

From the clear terms of paragraphs 3(j) and 5(a), it is evident that after entering the Agreement to buy Chambers–Storck from defendant, plaintiff had at least two possible causes of action in the event the representation about compliance with environmental laws was untrue. First, plaintiff would have had a contract claim for breach of warranty, based on the warranty in paragraph 3(j). Plaintiff does not dispute the possibility of such a claim, and indeed, included such a claim in the Complaint.[9] Second, plaintiff may have had an indemnification claim for losses, costs and expenses resulting from the fact that Chambers–Storck was not in compliance with environmental laws, regulations, and ordinances, based upon the indemnification provision in paragraph 5(a). Indeed, plaintiff is claiming indemnification for precisely such losses, costs and expenses. The parties dispute the meaning of the limitation to causes of actions based upon paragraphs 3(j) and 5(a) contained in paragraph 5(c).

---

**7.** Defendant is only required to indemnify plaintiff in certain circumstances. First, the "losses, costs or expenses" sustained by plaintiff must "arise from any event or transaction in connection with the business or properties of the Company occurring prior to the date as of which such representations and warranties are made...." Agreement ¶ 5(a). Second, defendant is only responsible if the "losses, costs or expenses" are (1) not adequately covered by insurance; (2) not adequately and fully reflected in or reserved against in the financial statements of the Company as of June 30, 1979 or October 31, 1979, as the case may be; (3) occurring after June 30, 1979 but prior to the date hereof and not in the ordinary course of business; or (4) not approved by defendants in

writing. *Id.* Third, defendants' obligation for indemnification applies "only if such losses, costs or expenses exceed in the aggregate the sum of Seven Thousand Five Hundred Dollars ($7,500), and only to the extent of such excess." *Id.* Defendants have not contended that any of these provisions are a defense to plaintiff's claim in this case.

**8.** Defendants' Memorandum at 6.

**9.** *See* Plaintiff's Opposition at 11 (discussing contract claim for breach of warranties); Complaint (Count 1); *see also supra* at 4–5 (Count 1 dismissed absent objection).

### 3. *Paragraph 5(c)*

Paragraph 5(c) provides, in relevant part, that

[i]n the event of a breach of the representation and warranty set forth as the last sentence of Paragraph 3(j) hereof, *no claim for indemnification* for losses, costs or expenses described in paragraph 5(a) shall be made against Seller unless notice of such claim is given to Seller on or before October 31, 1982.... (emphasis added).

### B. The Parties' Interpretations of the Agreement

The parties have entirely different interpretations of the limitation contained in paragraph 5(c). Plaintiff contends that paragraph 5(c) contains a limitation on "[a]ny contractual claims for breach of the warranties" running from defendants to plaintiff. Plaintiff's Opposition at 11. "[A]ccording to the terms of the contract" in paragraph 5(c), plaintiff argues, such contractual claims must have been brought before October 31, 1982. *Id.* However, plaintiff argues that the "CERCLA, state environmental, tort, and property claims, ... which are not based on defendants' representations and warranties and are not even based on the underlying contract, are clearly not barred by the time limitation provided in Paragraph 5(c) of the ... Agreement." *Id.* at 13. Furthermore, plaintiff asserts that it "intended only to take on the risk that any claim it had for breach of the contractual warranties given to it by [defendants] would be barred after a three-year preservation period." *Id.* Plaintiff insists that, in any event, "[t]he time bar contained in the indemnification provision of the Agreement is not sufficient under either federal or state law[ ] to transfer liability under CERCLA" because "in order for such a transfer ever to be effective, the party accepting liability must have knowingly accepted it." *Id.* at 15 (footnote and citations omitted).

The Freedman defendants contend, on the other hand, that the clear and unambiguous terms of the Agreement bar all of plaintiff's environmental claims in Counts 1–7. Defendants' Memorandum at 5–7. They argue that "[a]ll seven counts of Armotek's claim, regardless of the legal theory in which they are clothed, are indeed claims for 'losses, costs or expenses described in Paragraph 5(a).'" *Id.* at 6. As defendants read paragraph 5(c) of the Agreement, any "claims for indemnification for environmental liabilities" may be sustained only if notice of such claim was provided to defendants "on or before October 31, 1982." *Id.* at 7. Since plaintiff does not contend that it gave notice any earlier than March 22, 1985, defendants argue that all seven counts are barred by the contractual limitation. *Id.*

In response to plaintiff's interpretation of paragraph 5(c), defendants contend that "[t]he text of paragraph 5(c) ... clearly includes *all* indemnification claims in its ambit...." Defendant's Reply at 15 (emphasizing language of the Agreement stating that "*no* claim for indemnification ... shall be made"). Furthermore, defendants emphasize that "paragraph 5(a) expressly states that indemnification claims for losses, costs and expenses can result from *either* breach of representations and warranties *or* claims resulting from the untruthfulness of the representations and warranties," *id.* (emphasis in original), and argues that "[i]t would render part of the text of 5(a) superfluous if, as plaintiff insists, it were read to mean that only indemnity claims based on breach of representations and warranties were time barred." *Id.* at 15–16. Finally, defendants assert that the limitation in paragraph 5(c) clearly applies to Count 7, because the Agreement is specific enough to allocate responsibility for environmental clean-up costs so as to bar an action for contribution or indemnity under CERCLA. *Id.* at 19.

### C. Is Plaintiff's Interpretation Sufficiently Reasonable to Render the Agreement Ambiguous?

The parties have presented two distinct issues regarding the interpretation of the Agreement: (1) Whether the limitation in paragraph 5(c) limits only contractual claims based on breach of warranty, or

whether it is a limitation on claims for indemnification; and (2) Whether the Agreement is sufficient under CERCLA to limit the claim for indemnification in Count 7.

### 1. *The Agreement Limits Claims for Indemnification*

■ Plaintiff's interpretation of paragraph 5(c) of the Agreement as a limitation only on contractual claims is not "sufficiently reasonable to render the clause ambiguous within the meaning of *Heyman.*" *Wards Co., Inc.*, 761 F.2d at 121. It is notable that plaintiff is not asking the court to consider the ambiguity of any one phrase or word, but rather, seems to be asking the court to ignore or disregard the plain language of the Agreement. Specifically, plaintiff contends that paragraph 5(c) limits *only* claims for breach of representation or warranty—in other words, breach of contract. Quite plainly, however, paragraph 5(c) does not directly limit claims for breach of contract. Rather, it specifically refers to "claim[s] for indemnification." Plaintiff fails to explain how the court can consider plaintiff's reading to be "fairly reasonable" when there are simply no words in paragraph 5(c) that refer to a "claim" for breach of contract, or words that indicate that the court should ignore the specific reference to "claim[s] for indemnification." Accordingly, there is simply no basis in the Agreement for the argument that paragraph 5(c) has anything to do with directly limiting claims for breach of contract. Accordingly, plaintiff's interpretation is not "sufficiently reasonable" to render the Agreement ambiguous with respect to the kinds of claims it limits, since it clearly and unambiguously limits "claim[s] for indemnification."

It is equally clear that the Agreement limits all claims for indemnification arising out of the representations and warranties contained in paragraph 3(j), whether that claim is described as arising out a "breach" of the representations and warranties or arising from the "untruthfulness" of the representations and warranties. The first phrase of paragraph 5(c) describes the event upon which a claim for indemnification may arise: "In the event of a breach ... no claim for indemnification ... shall be made...." Paragraph 5(a), which is the basis for plaintiff's claim for indemnification, clearly anticipates that a claim for indemnification may arise from either the "untruthfulness" or the "breach" of a representation and warranty.

Apparently relying upon the fact that paragraph 5(a) refers to both "breach" and "untruthfulness," while paragraph 5(c) only refers to "breach," plaintiff contends that paragraph 5(c) limits only claims for indemnification that arise from a "breach" of the representations and warranties; it seems to argue that the parties did not intend paragraph 5(c) to limit claims for indemnification that arise from the simple "untruthfulness" of the representations and warranties. Even if there could be a "breach" in this case in the absence of "untruthfulness," plaintiff's argument is without merit. First, there simply cannot be a "breach" of the representations and warranties in paragraph 3(j) without the representations and warranties also being "untrue;" the reference to "in the event of a breach" in paragraph 5(c) of necessity includes "the event of untruthfulness." In the instant case, plaintiff's claims for indemnification undoubtedly result from the fact that the representations and warranties in paragraph 3(j) proved to be "untrue," because its losses, costs and expenses directly result from an order imposed by the DEP to compel them to clean up the Chambers–Storck site because it was not in compliance with environmental laws, regulations and ordinances as Electric had represented. If Electric's representations were "untrue," the representations and warranties that Chambers–Storck was in compliance with all environmental laws and regulations were also "breached." Second, plaintiff itself explicitly recognized that the "untruth" of the representations and warranties were equivalent to a "breach" of the representations and warranties by asserting the breach of contract claim in Count 1 of the Complaint. Therefore, the claim for indemnification in this case arose "in the event of a breach" and it is subject to the time limitation in paragraph 5(c). Third, is it not at all clear why

the parties would draft a provision such as paragraph 5(a), which allows plaintiff to be indemnified in the event of "untruthfulness" or "breach," and at the same time draft a provision such as paragraph 5(c), which only limits indemnification in the event of a "breach." At least at first glance, this appears to allow plaintiff to escape the time limitation by choosing to describe the representation and warranty as simply "untrue," rather than "breached." Such a construction of the contract leads to irrational results. Therefore, plaintiff's interpretation lacks "sufficient reason" to render the Agreement ambiguous on this issue. *Wards Co., Inc.*, 761 F.2d at 121.

There is no dispute that all of the claims in the Complaint seek to "recover costs of remediation," Plaintiff's Opposition at 2, or, in other words, seek indemnification from defendants for clean-up costs resulting from the "untruth" and "breach" of the representations and warranties that the Chambers–Storck site was in compliance with environmental laws and regulations. Therefore, regardless of how the count is framed, whether as negligence in Count 4 or as strict liability in Count 5, each count seeks indemnification for the $35,000 plaintiff spent to comply with the DEP order. All of the counts in the Complaint are therefore barred by the plain language of the Agreement because paragraph 5(c) provides that notice of claims for indemnification based upon the representations and warranties regarding environmental liabilities must have been given by no later than October 21, 1982. Plaintiff did not dispute in its papers or at oral argument that notice was not given by that time. Indeed, it is not disputed that notice was not given until March 22, 1985. Thus, plaintiff failed to meet the contractual deadline for asserting any claim for indemnification for environmental liabilities by more than two years.

## 2. *The Agreement Limits the CERCLA Claim in Count 7*

■ Plaintiff claims, however, that the "time bar contained in the indemnification provision of the Agreement is not suffi-cient under either federal or state law[ ] to transfer liability under CERCLA." Plaintiff's Opposition at 15. Plaintiff contends that "in order for such a transfer to be effective, the party accepting liability must have knowingly accepted." *Id.* (citing *Allied Corp. v. Frola*, 730 F.Supp. 626 (D.N.J.1990)). Plaintiff argues that since "there was no knowing acceptance of any transfer of liability," *id.*, the CERCLA claim in Count 7 cannot be barred. Plaintiff's position is not supported by the facts of this case or by applicable law.

Notwithstanding the suggestion in plaintiff's brief that it is questionable "whether CERCLA liability can be transferred among responsible parties," Plaintiff's Opposition at 16 n. 3, plaintiff conceded at oral argument that CERCLA and other environmental liabilities can indeed be transferred among contracting parties. *See supra* note 5 and accompanying text; *Purolator Products Corp.*, 772 F.Supp. at 129. Plaintiff argues, however, that the Agreement is not specific enough to constitute a transfer of CERCLA liability. I do not agree.

■ It is true that the Agreement does not refer specifically to any particular environmental laws, regulations or ordinances, including CERCLA. Indeed, CERCLA had not even been enacted at the time of the Agreement. However, contract provisions allocating CERCLA-type liabilities are nonetheless enforceable when those contracts have been entered into prior to the enactment of CERCLA. *See, e.g., id.* at 132; *Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 358 (D.N.J.1991); *Jones–Hamilton Co. v. Kop–Coat, Inc.*, 750 F.Supp. 1022, 1028 (N.D.Cal.1990); *FMC Corp. v. Northern Pump Co.*, 668 F.Supp. 1285, 1292 (D.Minn.1987). The test is not whether the parties specifically referred to CERCLA in the Agreement, but rather, whether the text of the Agreement conveys an intention of the parties to allocate CERCLA-type environmental liability. *Mobay Corp.*, 761 F.Supp. at 358 ("in order for the Court to interpret a contract as transferring CERCLA liability, the agreement must at least mention that one party

is assuming environmental-type liabilities"); *Rodenbeck v. Marathon Petroleum Co.,* 742 F.Supp. at 1456 (contract can act to preclude recovery of CERCLA response costs, but "there must be a provision in the contract which allocates risks of this nature to one of the parties").

In the circumstances presented here, it is clear from the unambiguous language of the Agreement that the parties allocated the risk of all liabilities arising from violations of environmental laws, regulations, and ordinances. That risk was allocated to the seller, Electric, for a period of three years after the sale of the property, until October 31, 1982, because it agreed to indemnify plaintiff for any losses, costs or expenses resulting from the fact the Chambers–Storck site was not as represented— that is, that it was not in compliance with environmental laws, regulations and ordinances. After October 31, 1982, the risk that the Chambers–Storck property was not in compliance with environmental laws, regulations and ordinances was shifted to the buyer, plaintiff in this case. That risk was allocated to plaintiff because plaintiff agreed, in no uncertain terms, that after October 31, 1982, "no claim for indemnification" resulting from environmental liabilities could be made against the seller, Electric. The specific allocation of the risk of losses, costs and expenses resulting from environmental violations incorporated into the Agreement by the parties is sufficient to transfer liability under CERCLA to plaintiff after October 31, 1982.

In the face of the plain language of the Agreement, plaintiff cannot argue persuasively that it was unaware that indemnification for its CERCLA-type liability was limited after October 31, 1982. Paragraph 5(j) of the Agreement refers to "environmental laws, regulations and ordinances relating to treatment, disposal and removal of liquid, solid and gaseous wastes," and the Agreement specifically considered compliance with DEP permit requirements, *see* Defendants' Memorandum at 6 (discussing Ex. F to the Agreement). Furthermore, it is worth noting that plaintiff has not been held liable under CERCLA. Indeed, a claim has never been made by either the government or any other party that plaintiff is liable under CERCLA. Rather, the actual costs that plaintiff has alleged it has incurred, a sum of $35,000, were spent in order to comply with an order of the DEP under Connecticut state law.

Whether plaintiff describes the alleged losses, costs and expenses it has incurred as "response costs" under CERCLA (Count 7); as "costs and expenses in mitigating the effects of pollution" recoverable under state law (Count 6); as "damages" resulting from defendants' ultra-hazardous activity (Count 5); as "damages" for "clean up" arising from defendants negligence (Count 4); as "losses" arising from the "polluted condition" (Count 3); or as "damages" from the breach of the warranty regarding environmental compliance (Count 1), they are losses, costs and expenses assertedly resulting from the non-compliance of the Chambers–Storck site with all environmental laws, regulations and ordinances at the time of sale. Inasmuch as plaintiff consented in the Agreement to the burden of bearing those losses, costs and expenses after October 31, 1982—regardless of how they were later characterized and regardless of the applicable statute, regulation or ordinance—it cannot now assert a claim for indemnification for them against defendants. Accordingly, summary judgment shall enter for defendants and against plaintiff on all counts of the Complaint.

## II. *Statute of Limitations*

Even if the Agreement did not explicitly limit the claims in Counts 3, 4 and 5, those claims would be barred by the applicable statute of limitations. The parties agree that the applicable statute of limitations for Counts 3, 4 and 5 is Conn.Gen.Stat. § 52–577c ("section 52–577c"). Section 52–577c requires that actions be brought within two years from "the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered...." An injury or damage is "discovered" when "[t]he harm to be alleged ... become[s] actionable; that is, the plaintiff must have discovered all the essential elements of the cause of action it

seeks to assert." *West Haven School District v. Owens–Corning Fiberglas Corp.,* 721 F.Supp. 1547, 1556 (D.Conn.1988).

■ Plaintiff does not dispute that it sent a letter to Electric on March 22, 1985 "notifying it of the DEP Abatement Order and of Armotek's intention to seek indemnification from defendants." Plaintiff's Opposition at 28; *see* Declaration of Jeffrey R. Martin in Support of Defendant's Motion for Summary Judgment (filed Sept. 12, 1991) ("Declaration of Martin"), Ex. A. ("March 22, 1985 letter"). Defendants argue that this letter, standing alone, "indisputably evidences discovery by plaintiff of 'property damage' in the form of chemical contamination" by no later than March 22, 1985. Defendants' Memorandum at 12. According to defendants, plaintiff's claims, filed more than three years later (in 1988), are barred as a matter of law by section 52–577c.

The March 22, 1985 letter is clear evidence that plaintiff knew that (1) Electric was a former owner and operator and thus a potential polluter of the Chambers–Storck site, and (2) as of February 25, 1985, the pollution at the Chambers–Storck site had been investigated by the DEP and an Abatement Order had been issued by the DEP to plaintiff to clean up the site. Moreover, the March 25, 1985 letter explicitly states that plaintiff had concluded that "Freedman is obligated to indemnify Armotek and hold Armotek completely harmless with respect to any and all environmental and related damage which may have occurred...." It states, further, that "[f]ormal demand is hereby made...." In addition, it recites the legal bases for which plaintiff believed it had a claim against defendants and indicates that plaintiff had obtained "special Connecticut counsel to assist in evaluating these areas...." Finally, it asserts that "Armotek intends to vigorously pursue its analysis of the situation and will thereafter take such steps, including legal action, as may be appropriate."

Plaintiff argues that the letter is not evidence that it had discovered all of the elements of its cause of action because "it had yet to initiate the investigative process that would eventually lead to the discovery of property damage caused by defendants." [10] Indeed, the letter specifically refers to "damage which may have occurred" and "damages Armotek and/or Chambers may incur or suffer in this matter." Plaintiff also contends that it did not know on March 22, 1985 exactly which entity caused the property damage.[11] It is true that the letter does not indicate that Armotek had concluded that Electric was necessarily responsible for any damage that may have occurred, only damage that occurred during the period between "November 1, 1979 or anytime subsequent to that date on account of conditions which existed at November 1, 1979." Accordingly, there is at least a material issue of fact regarding whether plaintiff had discovered the elements of actual injury and causation by March 22, 1985. Therefore, I am unable to conclude, as defendants argue, that the March 22, 1985 letter clearly evidences plaintiff's discovery of "all the essential elements of the cause of action it seeks to assert," *West Haven School District v. Owens–Corning Fiberglas Corp.,* 721 F.Supp. at 1556, so that the statute of limitations can confidently be said to have begun running for Counts 3, 4 and 5 on March 22, 1985.

■ However, section 52–577c provides that the statute of limitations also begins to run when "in the exercise of reasonable care" plaintiff should have discovered the injury. The March 22, 1985 clearly shows that plaintiff had "'knowledge of facts which would put a reasonable person on notice'" that it was injured and that the injury was caused by the wrongful conduct of another. *Catz v. Rubenstein,* 201 Conn. 39, 47, 513 A.2d 98 (1986) (quoting *Mastro v. Brodie,* 682 P.2d 1162, 1168 (Colo.1984) and citing cases from numerous other districts for proposition that courts should focus on "knowledge of facts" in determining when statute of limitations begins to run). Over three years before plaintiff

**10.** Plaintiff's Opposition at 29–30.

**11.** *Id.* at 30.

sued defendant, plaintiff had detailed information regarding contamination at the Chambers–Storck site and defendants' potential responsibility for that pollution. Plaintiff fails to account for the delay in determining the casual connection between pollution at the Chambers–Storck site and any connection with defendants' ownership and operation of the site. In light of all of the facts of which plaintiff was indisputably aware by March 22, 1985, reasonable investigation would have lead to the discovery of all of the elements of the claims asserted in Counts 3, 4, and 5 well before June 1986. Accordingly, inasmuch as the Complaint was not filed until on or about June 23, 1988, the claims asserted in Counts 3, 4, and 5 are barred by the two-year statute of limitations provided by section 52–577c.[12]

### III. *Helene Freedman*

■ Although the claims against Helene Freedman have been disposed of as barred by the Agreement and as untimely, I address defendants' argument that plaintiff has offered no evidence which would create a genuine dispute of material fact on the issue of whether Helene Freedman benefitted from or could have prevented improper disposal practices at Chambers–Storck. Plaintiff opposes summary judgment on the claims against Helene Freedman on the basis that discovery is not completed and it has not been determined if Helene Freedman benefitted from or could have benefitted from the illegal practices which led to contamination of the plant site.

Plaintiff has named Helene Freedman as a defendant because she is an officer and shareholder of Electric and was a director of Chambers–Storck. Plaintiff does not dispute the proposition that corporate liability is not based simply upon whether a party is an officer, director or shareholder, but depends on the specific activities of a party, including the level of involvement in day-to-day business operations, and participation in decisions regarding disposal of

hazardous waste. *See United States v. McGraw–Edison Co.*, 718 F.Supp. 154, 157–58 (W.D.N.Y.1989) (several issues of material fact as to extent of shareholder's involvement in management and operations at time of alleged disposal of hazardous materials precluded summary judgment); *United States v. Nicolet, Inc.*, 712 F.Supp. 1193, 1203 (E.D.Pa.1989) ("[c]orporation which holds stock in another corporation ... and actively participates in its management can be held liable for cleanup costs incurred as a result of that corporation's disposal"); *see generally Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 352–54 (D.N.J.1991). Defendants contend that plaintiff has offered no evidence that Helene Freedman participated "in *any* pertinent way in or had *any* actual control over the Chambers–Storck business," Defendants' Reply at 4, and that plaintiff's speculation as to facts that may be sufficient to hold Helene Freedman liable is not enough to raise a genuine issue of material fact. *Id.* at 4–5. I agree.

Plaintiff does not dispute defendants' contention that there is absolutely no evidence that Helene Freedman benefitted from or could have benefitted from the hazardous waste discharge at issue. Rather, plaintiff simply asserts conclusorily that there is an issue of material fact that prevents summary judgment.

It is settled law that plaintiff may defeat the motion for summary judgment by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In this case, plaintiff has presented no facts at all, much less specific facts, sufficient to create a material issue of fact as to Helene Freedman's liability for any of the claims against her in the Complaint. The undisputed evidence is that Helene Freedman "never took an active role in doing anything" regarding the Chambers–Storck Company. Declaration

---

**12.** Defendant also argues that Count 5 should be dismissed because chromium-plating is not an ultra-hazardous activity. Inasmuch as Count 5 fails as barred by the Agreement and the statute of limitations, I need not address here the question of whether chromium-plating constitutes an ultra-hazardous activity for purposes of strict liability.

of Martin, Ex. B (Deposition of Helene Freedman dated Oct. 9, 1990) at 6. In the absence of specific facts that dispute this evidence, plaintiff's conclusory allegations and denials in its memorandum and at oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980).

■ Although the parties were afforded ample opportunity to conduct discovery,[13] plaintiff now belatedly suggests that further discovery is needed on this issue. Specifically, plaintiff stated at oral argument that it needed to do more investigation of defendants' records. However, plaintiff's request for additional discovery on the issue of whether Helene Freedman had any involvement in the allegedly unlawful activity is unavailing, because plaintiff has failed to file an affidavit in accordance with Rule 56(f) of the Federal Rules of Civil Procedure ("Rule 56(f)").[14] Under Rule 56(f), a party opposing a motion for summary judgment on the ground that additional discovery is needed must file an affidavit explaining

(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.

*Hudson River Sloop Clearwater, Inc. v. Department of Navy*, 891 F.2d 414, 422 (2d Cir.1989). Even if plaintiff had requested further discovery in its memorandum, which it did not, "[a] memorandum is not a substitute for an affidavit under Rule 56(f)." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985). "[T]he failure to file such an affidavit under Rule 56(f) is by itself enough to reject a claim that the opportunity for discovery was inadequate." *Id.*[15]

Inasmuch as plaintiff has presented no facts whatsoever creating a genuine issue of material fact for trial on the issue of whether Helene Freedman benefitted, or could have benefitted, from the allegedly illegal activity, and has failed to submit an affidavit pursuant to Rule 56(f) in support of its request for further discovery on this issue, summary judgment would have to enter for Helene Freedman and against plaintiff on all claims against Helene Freedman, quite apart from the other, independent grounds for dismissal of the claims against her.

### Conclusion

The Motion for Summary Judgment (filed Sept. 12, 1991) (Doc. # 54) of defendants Seymour Freedman, Helene Freedman and S. Freedman Electric, Inc. is GRANTED absent objection with respect to Counts 1 and 2 and that part of Count 6 brought pursuant to Conn.Gen.Stat. § 22a–451. The motion is otherwise granted in its entirety for the reasons stated above. Summary judgment shall enter for the

**13.** Discovery was conducted in this case for more than a year after it was removed to this court (from July 1988 until November 1989). After November 1989 there was apparently no activity in this case. Accordingly, on May 21, 1990, the Clerk issued a notice pursuant to Rule 16 of the Local Rules of Civil Procedure (D.Conn.), advising the parties that the case would be dismissed absent a satisfactory explanation from counsel within 20 days. Plaintiff filed a motion for extension of time to conduct discovery on June 11, 1990. The court granted the motion and ordered the case to be continued on the docket. *See* Endorsement Order (filed June 19, 1990). The record indicates that the parties have engaged in substantial discovery since that time.

**14.** Rule 56(f) provides that

[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

**15.** Courts have also denied an application for further discovery when the affidavit was insufficient under Rule 56(f). *See Hudson River Sloop*, 891 F.2d at 422; *United States v. Ruegsegger*, 702 F.Supp. 438, 448 (S.D.N.Y.1988); *Association of Contracting Plumbers, Inc. v. Local Union No. 2*, 676 F.Supp. 523, 536 (S.D.N.Y.), *aff'd*, 841 F.2d 461 (2d Cir.1988).

396

Freedman defendants and against plaintiff on all counts in the Complaint.

It is so ordered.