**Joseph CALABRESE, Sr., Plaintiff,**

v.

**Raymond F. MCHUGH, Jr., as Executor of the Estate of Raymond McHugh, Scovill Fasteners, Inc., and Saltire Industrial, Inc., Defendants.**

**No. 3:98CV01603(GLG).**

United States District Court,
D. Connecticut.

Oct. 18, 2001.

Nicholas J. Harding, Mary A. McQuee-ney, Kosloff & Harding, West Hartford, CT, for Joseph Calabrese, Sr.

Thomas M. Armstrong, Dominic Fulco, III, Kevin Michael Tighe, Reid & Riege, P.C., Hartford, CT, for Raymond McHugh.

Thomas F. Harrison, Day, Berry & Howard, Hartford, CT, Peter R. Knight, LeBoeuf, Lamb, Greene & MacRae, Hartford, CT, Charles A. Perry, Rita A. Sheffey, Benjamin F. Johnson, IV, Hunton & Williams, Atlanta, GA, for Scovill Fasteners Inc. and Saltire Indus. Inc.

## *OPINION*

GOETTEL, District Judge.

Plaintiff, Joseph Calabrese, Sr., is the owner of a 7.9–acre parcel of land located on Store Avenue, in Waterbury, Connecticut (the "Store Avenue Property"), which he acquired in 1973 and 1986 from Raymond McHugh, Sr. This property, once used as a landfill, has become contaminated with hazardous substances, and plaintiff now seeks to hold the defendants responsible for the costs of remediation. In a thirteen-count, amended complaint, plaintiff has asserted claims against defendants under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 *et seq.,* ("CERCLA"), and various state statutes, as well as numerous common-law theories of recovery. The defendants have moved for summary judgment on all counts of the amended complaint [Doc. # 41 & # 45]. For the reasons discussed below, these motions will be GRANTED.

We begin our consideration of the voluminous papers filed by the parties by noting that plaintiff has dropped his claims in Count I brought under § 107 of CERCLA, 42 U.S.C. § 9607, and has conceded that his nuisance claims asserted in Count VII fail to state a claim upon which relief may be granted. *See* Pl.'s Objections to Mot. for Summ. J. [Doc. # 61 & # 59]. Accordingly, summary judgment will be granted in favor of defendants on Counts I and VII of the First Amended Complaint.

As to the remaining counts, a brief discussion of the history of the Store Avenue Property is necessary. The following background facts are not disputed.

## Background

Going back to 1811, a company called Scovill Manufacturing Company [1] manufactured brass products such as buttons, belt buckles, clasps, and other small items in Waterbury, Connecticut. From approximately 1919, Scovill Manufacturing used a 30–acre parcel, located less than a mile from its plant, for disposing of ash, cinder and other materials from its manufacturing operations (the "Scovill Landfill"). The Store Avenue Property was part of this 30–acre landfill.

Plaintiff grew up in a house located next to the Store Avenue Property. He describes it as a "big hole, ... a swamp," which covered nearly the entire 7.9 acres except around the perimeter. Pl.'s Dep. at 71–72. Plaintiff recalls that, until 1972 or 1973, green Scovill Manufacturing trucks would dump materials, including ash, cinders, brass, and mirrors onto the property on nearly a daily basis. Pl.'s Dep. at 73, 76, 86–88, 97. Plaintiff also recalls construction materials being dumped there. *Id.* at 88–89. By the time plaintiff acquired any interest in the property, the land filling operation was complete, sand had been brought in to cover the landfill, and the land was level. Pl.'s Dep. at 100.

Beginning in 1941, Scovill Manufacturing began selling off portions of the Scovill Landfill. The first 23 acres that were sold were developed as residential property with condominiums, apartments and housing for the elderly. On July 5, 1972, Scovill Manufacturing conveyed the last 7.9–acre parcel, the Store Avenue Property, to the Scovill Foundation, Inc., which on the same day conveyed the property to Raymond McHugh, Sr. The recorded warranty deed from Scovill Foundation to Raymond McHugh, Sr., contained the following language:

The Grantee has knowledge that Scovill Manufacturing Company is dumping and has the right to continue to dump ashes and other material on the aforesaid property until June 30, 1974.

The Grantee, for himself, his heirs and assigns, by acceptance of this deed, agrees that he will not make any claim for loss or damage against Scovill Manufacturing Company or the Grantor based on use by Scovill Manufacturing Company, or its successors, of aforesaid land, or maintain any suit based on such use, and expressly recognizes that said land is and will continue to be used by Scovill Manufacturing Company as a dump for fly-ash, cinders and other refuse from its manufacturing operations.

Substantially similar language was contained in the warranty deed from Scovill Manufacturing to Scovill Foundation.

Subsequently, on April 11, 1973, McHugh, Sr., conveyed to plaintiff by quit claim deed an undivided one-half interest in 0.995 acres of the Store Avenue Property, with improvements thereon.

Pursuant to a quit claim deed dated August 30, 1973, McHugh, Sr., conveyed to plaintiff an undivided one-half interest in the entire remaining Store Avenue Property.

A Certificate of Title dated July 10, 1984, prepared by a title search company for plaintiff's attorney, noted the covenant in the deed from Scovill Foundation to McHugh, Sr., quoted the language of the covenant, and advised that "[t]his covenant may affect said premises."

On January 31, 1986, by warranty deed, McHugh, Sr., conveyed the remaining one-half interest in the Store Avenue Property to plaintiff. Plaintiff admits that he was

---

1. Scovill Fasteners, Inc., is referred to throughout this decision as "Scovill." Scovill Manufacturing Company, which no longer exists, is referred to as "Scovill Manufacturing."

aware of the Certificate of Title prior to his acquisition of the remaining one-half interest, although there is no evidence in the record before us that plaintiff had actual knowledge of the release set forth in the Scovill Foundation/McHugh deed. *See* Pl.'s Dep. at 62–63. Plaintiff also concedes that he made no inquiries concerning the environmental condition of the property prior to his acquisition of any portion of the Store Avenue Property.

All of the deeds conveying the Store Avenue Property to plaintiff were appropriately recorded.

In 1988, plaintiff began development of the Store Avenue Property for the construction of a 195–unit apartment complex for the elderly. In March, 1989, in response to citizen complaints about potential wetlands violations, the State of Connecticut Department of Environmental Protection ("State DEP") inspected the Store Avenue Property. Initially, their tests revealed no contamination. However, further tests revealed twelve capacitors[2] on the surface of excavation piles at the site. The metal casings of some of the capacitors had rusted, allowing polychlorinated biphenyl contaminated oil ("PCB's") to leak into the surrounding soil. Soil samples taken from the area indicated potentially extensive contamination. The State DEP asked plaintiff to cease construction on the Store Avenue Property, to restrict access to the property due to the PCB contamination, and to remove the capacitors. The City of Waterbury Department of Public Health also sent plaintiff several letters ordering him to abate the hazard caused by the high levels of PCB's.

As of March 31, 1989, plaintiff ceased all construction activities on the Store Avenue Property, and never resumed construction. Pl.'s Dep. at 147. Plaintiff testified that in response to orders from the DEP, he removed the capacitors and did everything he was required to do, except for a few "minor things" such as failing to label the barrels in which he disposed of the capacitors. Pl.'s Dep. at 80–81, 148–50. The State DEP then referred the Store Avenue Property to the United States Environmental Protection Agency ("EPA") for PCB enforcement pursuant to the Toxic Substance and Control Act Cooperative Grant Agreement.

On May 10, 1989, the State DEP and plaintiff entered into a consent order that required plaintiff to cease all construction activities and to submit a written plan to address the potential dangers at the construction site. Plaintiff retained an environmental consulting firm, HRP Consultants, to investigate the Store Avenue Property for possible environmental contamination. In July, HRP Consultants submitted an environmental assessment to the State DEP on the contamination that they found at the Store Avenue Property, which included the presence of PCB's and other contaminants in the soil and groundwater. *See* HRP Study.

On October 12, 1989, the State DEP issued an Enforcement Order against plaintiff requiring him, *inter alia,* to investigate the wastes on the site and the potential impact of such wastes on human health and the environment and to perform remedial actions approved by the DEP Commissioner to prevent and abate soil, air, ground water, and surface water pollution. According to plaintiff, he did not comply with this order. Pl.'s Dep. at 153.

---

**2.** A "capacitor" is a device for accumulating and holding a charge of electricity, consisting of two conductors separated by a dielectric and having equal, opposite charges. *The Random House College Dictionary* at 200 (rev. ed.1980).

In June, 1990, the EPA filed an administrative complaint against plaintiff's construction company based upon PCB contamination at the Store Avenue Property.

Plaintiff testified in his deposition that after he had the testing done on the property and removed the capacitors, he had done all that he could afford to do. He was informed that further testing was required. According to his testimony, he responded:

"I cannot afford it anymore, I'm broke," and a little while after that I went Chapter 11, and that was the end of it, and that's how that started. I wanted to get this thing so I could finish the project because I could have made money doing it, and I was told I could not go on the site anymore.

Pl.'s Dep. at 84. Plaintiff testified that the last time he went to the property was when he had to give the EPA permission to go on the property to excavate the soil. *Id.*

On December 21, 1993, Raymond McHugh, Sr., died and Raymond McHugh, Jr., was appointed executor of his estate.

On June 20, 1994, Calabrese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Included in his schedules of claims was a claim against the McHugh Estate for failing to disclose environmental problems associated with the Store Avenue Property. No claim against Scovill Manufacturing or any related entity was listed. Plaintiff took no further action with respect to the claim against the McHugh Estate until the filing of this lawsuit.

On May 30, 1996, the State DEP issued an order to plaintiff and his construction company setting out a detailed schedule of remedial action required at the Store Avenue Property. Various meetings took place between plaintiff, the State DEP, and the EPA.

In March, 1997, plaintiff, as president of his construction company, entered into a consent agreement with EPA, in which EPA waived all civil penalties against the corporation based upon its inability to pay. The consent agreement specifically provided that it was not binding on plaintiff individually.

In January, 1998, EPA gave the State DEP authority to begin its Phase I Assessment of the Scovill Landfill, including the Store Avenue Property. The State DEP began work at the site and observed what they reported as "newly discovered problems" on the Store Avenue Property, although it is not clear what these newly discovered problems were. State DEP Environmental Site Assessment at 7; *see* Discussion at 25, *infra.* Further testing and soil sampling was performed and clean-up activities were initiated by DEP. Plaintiff testified that he had "no clue" as to how much soil they removed or what they were doing but he knows that they "spent a lot of money, and they took out a lot of material, and its wasn't just capacitors; they found more capacitors as they excavated . . ., and they found more contaminated material where [plaintiff] didn't even excavate." Pl.'s Dep. at 85. By August, 1998, the Store Avenue Property had been covered with fill, seeded and fenced. Environmental Site Assessment at 8; Pl.'s Dep. at 163.

Plaintiff himself was not involved in these remediation efforts, and the State DEP and EPA began cost recovery efforts against him. Plaintiff was advised that the costs would be in the range of $400,000 to $500,000. Pl.'s Dep. at 115–16.

On August 10, 1998, plaintiff commenced the instant lawsuit naming as defendants Raymond McHugh, Jr., as executor of the Estate of Raymond McHugh, Sr., Scovill

Fasteners, Inc., and Saltire Industrial, Inc. According to defendants, "[t]hrough various changes in corporate structure, Scovill Manufacturing Company now has become Saltire Industrial, Inc. and the former Scovill Apparel Fasteners division of Scovill Manufacturing has become Scovill Fasteners, Inc., a separately owned corporation." Def. Saltire & Scovill's Mem. in Support of Sum. Judgment Motion at 3. "[T]oday Saltire is the corporate successor to the former Scovill Manufacturing Company and is responsible for any relevant liabilities of the original Scovill Apparel Fasteners division of the Scovill Manufacturing Company." *Id.* at 5. (Plaintiff vehemently disagrees with defendants' attempts to absolve Scovill Fasteners, Inc., of liability in this case. In light of our rulings on the motions for summary judgment, which dispose of plaintiff's claims on the merits, we will not attempt to unravel the tangled web of corporate restructuring, spin-offs, and acquisitions.)

On August 21, 1998, plaintiff filed a Notice of Claim against the McHugh Estate for alleged pollution and contamination of the Store Avenue Property, arising out of the decedent's prior ownership of the property. The Notice of Claim states that the claim arose on April 29, 1998, when the State DEP issued a bill of costs for environmental cleanup of the property. Plaintiff further noted that the extent of the claim was unknown at that time and was "contingent upon the determination of the extent of liability of other involved parties and the possibility of further cleanup costs." *See* Notice of Claim dated Aug. 21, 1998. Plaintiff further requested that the Probate Court establish a reserve to secure the future payment of this claim. *Id.*

In 2000, the Scovill Landfill was placed on the National Priorities List and became eligible for cleanup under the CERCLA program (also known as "Superfund").

On February 2, 2001, subsequent to the filing of this action, the EPA sent Scovill and Saltire a Notice of Potential Liability for Scovill Industrial Landfill Superfund Site, Waterbury Connecticut, indicating that EPA considered them potentially responsible parties ("PRP's") for contamination at the Scovill Landfill Site (including the Store Avenue Property) and requesting their participation in clean-up activities and in making restitution for $130,900 in response costs incurred by EPA to date.

### Discussion

The general principles applicable to summary judgment motions are well-settled. Under Rule 56(c), Fed.R.Civ.P., summary judgment shall be rendered forthwith "if the pleadings, depositions, [and] answers to interrogatories ... together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The burden of showing that there is no genuine factual dispute rests upon the moving party. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir.1994). In assessing the record to determine if such issues exist, we are required to resolve all ambiguities in favor of the party against whom summary judgment is sought and to draw all permissible inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This remedy, which precludes a trial, is properly granted only when no rational jury could find in favor of the non-moving party. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir.), *cert. denied*, 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000).

### I. The Release in the Scovill Foundation/McHugh Deed

Defendants Saltire and Scovill first argue that all of plaintiff's claims against

them are barred by virtue of the release contained in the recorded Scovill Foundation/McHugh deed, which, they contend, is a real covenant running with the land that binds plaintiff as McHugh, Sr.'s successor-in-interest. They assert that this covenant runs with the land and is enforceable against plaintiff as a subsequent owner because: (1) it is in writing and was appropriately recorded; (2) the parties to the covenant intended that it run with the land, as evidenced by their use of the words "heirs and assigns;" (3) there is privity of estate; and (4) the covenant "touches and concerns" the land with which it runs in that it was an integral part of the land conveyance. *See Braithwaite v. Town of Wallingford*, No. 262168, 1991 WL 126464, at *7–9 (Conn.Super. June 28, 1991); *Riccio v. Geignetter*, No. CV90 0270555 S, 1991 WL 27826, at *1–2 (Conn.Super.Jan.10, 1991); *see also Chemotti v. State*, 194 Misc. 899, 88 N.Y.S.2d 879 (N.Y.Ct.Cl.1949) (holding that a release of the State from liability for damages to real estate, which was recorded, was a covenant running with the land, binding on the plaintiffs as successors in title to the agreement).

Plaintiff responds that the release is not a covenant running with the land because it was personal in nature, barring liability claims against Scovill Manufacturing, and it related to something collateral to the land, not the land itself. Plaintiff received no benefit from the covenant with respect to his use or enjoyment of the land. Further, the language of the release, which predates CERCLA, is not sufficiently specific to constitute a release of CERCLA claims. It is limited to use of the property as a dump for certain specified materials, cinders, flyash and "refuse," and does not

purport to release claims for any and all types of materials, including hazardous substances, that might be dumped at the property.

We consider this argument first because, if defendants are successful on this ground, it obviates the need to consider their remaining claims addressed to each separate count of plaintiff's complaint.

■■■ Connecticut law governs the validity of the release with respect to plaintiff's state-law claims. As to plaintiff's federal CERCLA claims, both sides agree that, in the Second Circuit, "[w]hile it is clear that federal law governs the validity of releases of federal causes of action … [courts should] look to state law to provide the content of federal law." *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 15 (2d Cir.1993); *Teleflex Inc. v. Collins & Aikman Prods. Co.*, 961 F.Supp. 368, 372 (D.Conn.1996), *aff'd*, 125 F.3d 845, 1997 WL 624991 (2d Cir.1997). As defendants point out, private parties may contractually allocate their liability to one another under CERCLA. *Keywell Corp. v. Weinstein*, 33 F.3d 159, 165 (2d Cir.1994). The fact that the release was executed prior to the enactment of CERCLA does not preclude its applicability to claims brought under CERCLA. *See Olin Corp.*, 5 F.3d at 15–16. "The test is not whether the parties specifically referred to CERCLA in the Agreement, but rather, whether the text of the Agreement conveys an intention of the parties to allocate CERCLA-type environmental liability." *Armotek Indus., Inc. v. Freedman*, 790 F.Supp. 383, 391 (D.Conn.1992).

■■■ Under Connecticut law, the question of whether a covenant runs with the land is material to the question of notice.[3]

---

**3.** The Connecticut courts have generally divided covenants into three classes: (1) mutual covenants in deeds exchanged by adjoining landowners; (2) uniform covenants contained in deeds executed by the owner of property who is dividing his property into building lots

If it runs with the land, it binds the owner of the land whether or not he had actual knowledge of it or not. If it does not run with the land, the owner is bound only if he has taken the land with notice of the covenant. *Bauby v. Krasow,* 107 Conn. 109, 139 A. 508, 509 (1927). Connecticut courts have held that whether a covenant runs with the land is to be determined based upon the intent of the parties to the covenant as expressed in the written agreement "read in the light of the circumstances attending the transaction and the object of the grant." *Bauby,* 107 Conn. at 113, 139 A. at 509; *see also Weeks v. Kramer,* 45 Conn.App. 319, 323, 696 A.2d 361, 363, *cert. granted in part,* 243 Conn. 917, 701 A.2d 339 (1997), *cert. dismissed as improvidently granted,* 244 Conn. 203, 707 A.2d 30 (1998). Additionally, the courts have been guided by the principle that the law does not favor restrictions. *Bauby,* 107 Conn. at 113, 139 A. at 510; *see also Anderson v. Bradley,* 23 Conn.Supp. 87, 89, 177 A.2d 227, 228 (1961)(holding that because restrictive covenants are in derogation of the common-law right to use land for all lawful purposes, they are to be narrowly construed and are not to be extended by implication). On the other hand, a right to enforce a covenant will not be inferred to be personal "when it can fairly be construed to be appurtenant to the land." *Bauby,* 107 Conn. at 113, 139 A. at 510.

▮ The major difficulty that we have with defendants' argument that the Scovill Foundation/McHugh release is a covenant running with the land is that it does not "touch or concern the land" nor is it "appurtenant" to the land, as those terms have been used by the Connecticut courts. *See Castonguay v. Plourde,* 46 Conn.App. 251, 258, 699 A.2d 226, 232, *cert. denied,* 243 Conn. 931, 701 A.2d 660 (1997); *Braithwaite,* 1991 WL 126464, at *7. "The determination of whether a covenant runs with the land requires a showing that the benefit or burden of the promises was intended to run with the land, that the promises made substantially altered the legal relations of the parties with respect to the land *i.e.* that the promises 'touch or concern' the land and that a succession of interest existed between the promis[or][sic] and the promisee." *Braithwaite,* 1991 WL 126464, at *8. If a covenant runs with the land, then its benefits or obligations pass with the ownership of the land. *Id.*

The release in this case concerned the liability of Scovill Manufacturing vis-a-vis McHugh, Sr., his successors and assigns, for any damages arising out of its use of the land, including the dumping of flyash, cinders, and refuse. It released Scovill Manufacturing from any liability that might arise from these activities, thus conferring a personal benefit on Scovill Manufacturing and its successors. It did not, however, confer a benefit on the remaining land that had been part of the Scovill Landfill nor did it impose any burden on the Store Avenue Property itself. *See* 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* §§ 12,19, 21 (1995). It did not restrict future uses of the Store Avenue Property, such as prohibiting the conduct of certain types of businesses for a reasonable period of time, or placing height restrictions or other limitations on buildings

under a general development scheme; and (3) covenants exacted by a grantor from his grantee presumptively or actually for the benefit and protection of the grantor's adjoining land which he retains. *Contegni v. Payne,* 18 Conn.App. 47, 51, 557 A.2d 122, *cert. denied,* 211 Conn. 806, 559 A.2d 1140 (1989). There is no requirement under Connecticut law, however, that all restrictive covenants fit neatly into one of these three general categories. *DeTullio v. Chebrah Bikur Cholim, Inc.,* No. CV 960334892S, 1999 WL 228975, at *2 (Conn.Super.Apr.7, 1999).

to be constructed, or serving as an overall development scheme. *See Dick v. Sears–Roebuck & Co.,* 115 Conn. 122, 160 A. 432, 433 (1932). The release of Scovill Manufacturing from liability did not affect the Store Avenue Property in any way, except to the extent that it might have influenced the sales price.

■■■ The release did contain words of succession, stating that it was binding on the Grantee, "his heirs and assigns," which the Connecticut courts have interpreted as creating a presumption that the parties intended the covenant to run with the land. *See Singer v. Wong,* 35 Conn.Supp. 640, 643, 404 A.2d 124, 125 (1978). Those words alone, however, cannot convert this release into a real covenant running with the land. *See Pulver v. Mascolo,* 155 Conn. 644, 651, 237 A.2d 97, 100 (1967). "It is well settled that a covenant personal in its nature and relating to something collateral to the land cannot be made to run with the land so as to charge the assignee by the fact that the covenantor covenanted on behalf of himself and his assigns." *Id.*

As the defendants concede, no Connecticut case has addressed whether a release or covenant not to sue can be construed as a covenant that runs with the land. Based on our review of Connecticut case law concerning covenants running with the land, we conclude that the release in the Scovill Foundation/McHugh warranty deed did not run with the land because it did not "touch" the land, although it was recorded and was clearly intended to bind the successors and assigns of McHugh.

There is no evidence in the record from which we can conclude that plaintiff had actual knowledge of the release.[4] Accordingly, having found that the release was personal in nature and not one running with the land, we hold that the release was enforceable only between the original contracting parties, and did not bind plaintiff. *See* 20 Am.Jur.2d, *Covenants, Conditions, and Restrictions* § 12 (1995).

## II. Claims' Accrual, Statute of Limitations, and Whether Each Count States a Claim Upon Which Relief May be Granted

Having determined that the Scovill Foundation/McHugh release does not bar this action by plaintiff, we turn now to defendants' remaining challenges to each of plaintiff's claims.

Defendants raise a several arguments relating to the timeliness of plaintiff's claims. First, Scovill and Saltire assert that plaintiff's claims arose prior to plaintiff's filing his bankruptcy petition, such that they are property of the bankruptcy estate and, thus, plaintiff lacks standing to bring these claims. The McHugh Estate asserts that all of plaintiff's claims arose prior to McHugh, Sr.'s death and are now time-barred by the Connecticut's statute of limitations governing claims against an estate, Conn. Gen.Stat. § 45a–375(c). Additionally, all defendants argue that each of plaintiff's state-law claims is barred by the applicable state statute of limitations. Finally, they argue that each of the claims fails to set forth a claim upon which relief may be granted.

### A. Plaintiff's Causes of Action against Scovill and Saltire as Property of His Bankruptcy Estate

Defendants Scovill and Saltire argue that plaintiff lacks standing to assert any

---

4. We need not address (and specifically make no finding at this time) whether the release would be binding on plaintiff under Connecticut state law if he had actual knowledge of the release. As defendants concede, this is an issue that has not been addressed by the Connecticut courts, and there is no reason for this Court to speculate as to how that issue would be decided.

256

of the claims raised in this action because they arose pre-petition and, as such, became claims of his bankruptcy estate.

As plaintiff concedes, "[c]laims that accrued prior to the bankruptcy belong to the Trustee." Pl.'s Mem. at 7. Property of the bankruptcy estate includes causes of action belonging to the debtor which accrued prior to the filing of the bankruptcy petition.[5] *Seward v. Devine,* 888 F.2d 957, 963 (2d Cir.1989). A claim arises for purposes of bankruptcy when "the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation ... under the relevant non-bankruptcy law." *In re The Duplan Corp.,* 212 F.3d 144, 151 (2d Cir.2000) (quoting *LTV Steel Co. v. Shalala (In re Chateaugay Corp.),* 53 F.3d 478, 497 (2d Cir.1995)) (internal citations and quotations omitted). A cause of action is part of the estate even if the debtor failed to schedule the claim in his petition. *Correll v. Equifax Check Services, Inc.,* 234 B.R. 8, 10 (D.Conn.1997). Although unscheduled claims may be abandoned by the trustee pursuant to 11 U.S.C. § 554(a) or (b), claims not abandoned by the trustee under those sections remain part of the estate even after closure of the bankruptcy case, and the debtor loses all rights to those claims in his own name. 11 U.S.C. § 554(d); *Correll,* 234 B.R. at 10. Where an unscheduled claim remains the property of the bankruptcy estate, a debtor lacks standing to pursue that claim after emerging from bankruptcy and the claim must be dismissed. *Correll,* 234

B.R. at 10; *see also Rosenshein v. Kleban,* 918 F.Supp. 98, 103 (S.D.N.Y.1996); *Tuttle v. Equifax Check Services, Inc.,* No. 3:96CV948(WWE), 1997 WL 835055 (D.Conn. June 17, 1997) (holding that the bankruptcy trustee is the real party in interest to prosecute a claim where the claim comprised part of bankruptcy estate).

While both parties agree on the applicable legal principles, they disagree on the factual issue of when plaintiff's claims against the defendants accrued for purposes of determining whether these claims were property of the bankruptcy estate. Plaintiff contends that his claims accrued in January, 1998, after his bankruptcy petition was filed, and that the claims in this lawsuit are separate and distinct from any pre-bankruptcy claims that he may have had relating to the removal of the PCB capacitors. Plaintiff emphasizes that he is not making any claims in this action for the contamination discovered prior to 1998 or for any clean-up costs associated therewith. Plaintiff states that, in 1997, he entered into a Consent Order with the EPA, relating solely to the PCB capacitors discovered on the Store Avenue Property during excavation operations, and that he believed that this Consent Order would constitute a final resolution of the environmental problems on his portion of the Scovill Landfill.[6] *See In re. Calabrese Construction Co.,* Docket No. TSCA–I–90–1080, Consent Agreement and Order dated Mar. 27, 1997 (U.S.EPA). However, when the State DEP began its Phase I Assess-

5. Section 541(a)(1) of the Bankruptcy Code defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The filing of a petition for bankruptcy marks the commencement of the bankruptcy case. 11 U.S.C. § 301.

6. According to the EPA Consent Agreement, during the March 22, 1989 inspection of the property, twelve PCB capacitors had been discovered on the surface of excavation piles at the site, some of which had leaked into the surrounding soil. Plaintiff's company was ordered to remove and dispose of the capacitors and to take further action to minimize the spread of contamination.

ment in January of 1998, additional contamination was discovered in the form of "newly discovered problems," and a new round of clean-up activities were commenced. *See* Scovill Industrial Landfill Environmental Site Assessment, Cerclis No. CT0002265551, at 7 (Dec. 2, 1998). Plaintiff states that he was told he would "get a big bill—upwards of 4 to 500,000 [dollars]," Pl.'s Dep. at 115, 163, and this "new understanding of the depth of the problem at the Store Avenue Property constitutes the discovery of an injury." Pl.'s Mem. at 8. Plaintiff states that both he and the State DEP "miss[ed] the big picture" by focusing on the capacitors and the surrounding contaminated soil and treating the problem as though a single removal action was sufficient. *Id.* "It wasn't until later on that the CT DEP and U.S. EPA focused on the Scovill Landfill as a whole and became concerned about the potential for site wide contamination." [7] *Id.* at 8–9. At a minimum, he argues, there is a genuine issue of material fact as to when his claims arose. *Id.* at 9.

Defendants respond that plaintiff's claims accrued no later than 1989 when the initial contamination was discovered, well before he filed his bankruptcy petition. Defendants note that the EPA Consent Order specifically stated that plaintiff would not be considered in full compliance until all soil and surface and ground water contamination had been abated to the State DEP's satisfaction [8] and that the EPA reserved the right to institute further proceedings against him. Thus, they argue, plaintiff cannot maintain that the con-

tamination discovered in 1989 had been fully abated and that the 1998 Phase I Assessment by the State DEP uncovered a new problem.

▬▬▬ In order to determine whether a debtor had a property interest in a cause of action at the time he filed for bankruptcy, we look to state law. *State Farm Ins. Co. v. Swift,* 129 F.3d 792, 795 (5th Cir. 1997). In Connecticut, a cause of action accrues when a plaintiff suffers actionable harm. *Champagne v. Raybestos–Manhattan, Inc.,* 212 Conn. 509, 521, 562 A.2d 1100 (1989). The fact that this accrual date may be different than the date on which the statute of limitations begins to run is irrelevant. As the Fifth Circuit discussed in *Swift,*

> We are determining when the [cause] of action accrued for purpose of ownership in a bankruptcy proceeding. The time of discovery of the injury is not relevant to this inquiry. A cause of action can accrue for ownership purposes before the statute of limitations for that cause of action has begun to run.

129 F.3d at 798; *see also In re Alipour,* 252 B.R. 230, 235 (Bankr.M.D.Fla.2000) (holding that the "accrual" of a cause of action for purposes of determining the trigger date for the statute of limitations may be different from the "accrual" of the action for purposes of determining whether the claim constitutes property of a bankruptcy estate under § 541 of the Bankruptcy Code); *In re Ellwanger,* 140 B.R. 891, 897 (Bankr.W.D.Wash.1992) (noting that it is often necessary to look to

---

7. Plaintiff points to the recent listing of the entire Scovill Landfill (of which the Store Avenue Property is one piece) on the National Priorities List, as compared to the earlier investigation and removal efforts which related solely to the seven-acre parcel owned by plaintiff. *See* Pl.'s Mem. at 9, n. 7.

8. The Consent Agreement ¶ 21 provided:

> Respondents are not deemed in full compliance with the Order until all required actions have been completed as approved by DEP, and until all soil, surface water and ground water contamination on or emanating from the site have been abated to DEP's satisfaction.

state law on statute of limitations to determine when a cause of action accrues because accrual is rarely discussed apart from that issue, yet cautioning that it is important to extract accrual principles only and not principles of discovery and tolling). In the *Alipour* case, the court held that the accrual test for purposes of § 541 was whether all of the elements of the cause of action had occurred as of the time the bankruptcy case was commenced, so that the claim was "sufficiently rooted in the debtor's prebankruptcy past." 252 B.R. at 235.

### 1. Counts III, IV, V, IX—Tort Claims

 Plaintiff has asserted tort claims for negligence (Count III), negligence per se (Count IV), reckless misconduct (Count V), and ultrahazardous activity (Count IX).[9] Plaintiff's tort claims accrue when an "actionable harm has been identified by a claimant." *Catz v. Rubenstein*, 201 Conn. 39, 513 A.2d 98 (1986). To have "actionable harm" a plaintiff must discover that he has been injured and that the defendant's conduct caused his injury. *Nash v. Yap*, 247 Conn. 638, 726 A.2d 92 (1999).

In this case, plaintiff had actual knowledge of the existence of environmental contamination on the Store Avenue Property in 1989. That same year, the environmental consulting firm that he had retained recommended to plaintiff that further testing and investigation of the site be performed. *See* HRP Study at 34–37. From 1989 forward, the Store Avenue Property was the subject of ongoing investigation and remediation efforts by the State DEP and EPA. Plaintiff engaged in some initial cleanup efforts, removing the twelve capacitors, but thereafter he did nothing further towards cleanup. As he testified,

> So now I say, "Okay are we all set now?" "Oh, no, we've got to do further testing." I said, "Wait a minute, where do we stop? Could anybody say, 'Do this,' and you're finished?" No one would give me that answer, they just said, "No, you do this and then we'll tell you after." And I started talking to different people around, and the way this thing goes is you do this, fine; okay, do further testing; do this, fine, and I would have been going on and on.

Pl.'s Dep. at 83–84.

Plaintiff argues that he executed a Consent Order with the EPA which he thought

---

9. Defendants also assert that Count IX fails to state a claim upon which relief may be granted because the activities alleged by plaintiff do not constitute ultrahazardous activities. The question of whether an activity is abnormally dangerous is generally a question of law for the court to decide. *Bernbach v. Timex Corp.*, 989 F.Supp. 403, 407 (D.Conn.1996) (Arterton, J.). As this Court noted in the *Bernbach*, the Connecticut Supreme Court has never ruled on whether the storage, disposal and failure to clean up hazardous wastes may constitute an ultrahazardous activity subject to strict liability. Although the *Bernbach* Court was unwilling to rule categorically that the handling of hazardous wastes could never give rise to strict liability, the Court found that the plaintiffs had failed to allege "circumstances and conditions" in the defendant's activities such that "irrespective of due care" the activities "involve a risk of probable injury to such a degree that [they] fairly can be said to be intrinsically dangerous." *Id.* (quoting *Arawana Mills Co. v. United Technologies Corp.*, 795 F.Supp. 1238, 1252 (D.Conn.1992)); *see also Nielsen v. Sioux Tools, Inc.*, 870 F.Supp. 435, 442 (D.Conn.1994) (declining to extend strict liability for the ultrahazardous activities to alleged conduct of a defendant involving the storage and use of hazardous materials). As in the *Bernbach* case, plaintiff in this case has not alleged activities on the part of defendants—particularly on the part of McHugh, Sr.—that would subject them to strict liability on the ground that they were engaged in an ultrahazardous activity.

would constitute a "final resolution of the issue," Pl.'s Brief at 8, but the Consent Order clearly informed him otherwise. It provided that "Respondents[10] are not deemed in full compliance with the Order until all required actions have been completed as approved by DEP, and until all soil, surface water and ground water contamination on or emanating from the site have been abated to DEP's satisfaction." Consent Order at 5. The Consent Order made clear that EPA reserved its rights to institute further proceedings. Consent Order at 6–7. There is nothing in the record that would indicate that, prior to 1998, all contamination had been abated, that plaintiff had no further obligation to remediate the hazardous waste on the Store Avenue Property, or that the contamination addressed by the State DEP in its Phase I Assessment was different than the contamination that had been discovered in 1989. It appears that the only "new" event in 1998 was the State DEP's Phase I Assessment of the site, which now included the entire Scovill Landfill, and the additional cleanup efforts and costs associated therewith. *See* Environmental Site Assessment at 7–8.

The Second Circuit's decision in *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 613–15 (2d Cir. 1996), is instructive on the question of whether a new cause of action arose in 1998 as a result of the State DEP's Phase I Assessment. In *BellSouth*, plaintiff owned a building in which defendant's asbestos-containing fireproofing material had been installed. Plaintiff filed suit to recover the cost of building-wide asbestos abatement, estimated at $85 million. The defendant argued plaintiff's action was time-barred because plaintiff had been on notice for over eight years that the building contained asbestos, and plaintiff had already incurred significant costs in conjunction with remedial efforts to prevent or reduce the asbestos contamination. The facts revealed that, following plaintiff's initial efforts at limited asbestos abatement (at a cost of approximately $2 million), an independent study in 1992 revealed that the fireproofing material had decayed, releasing asbestos particles, and that building-wide removal of the fireproofing material would be necessary. When plaintiff filed suit to recover these removal costs, defendant argued that plaintiff's claims were time-barred, to which plaintiff responded that it should not be charged with discovery of its injury until it knew with certainty that top-to-bottom abatement was immediately necessary. The Court rejected this argument and held that plaintiff's claims were time-barred, stating:

> Essentially, BellSouth argues that a claim does not accrue under a discovery statute of limitations until the plaintiff appreciates that the ultimate loss is or will be of a kind and magnitude that justifies a lawsuit.... BellSouth's theory of accrual, if adopted, would vitiate all discovery statutes of limitation....

*Id.* at 614. Quoting the Connecticut Supreme Court's decision in *Burns v. Hartford Hosp.*, 192 Conn. 451, 472 A.2d 1257 (1984), the Court held that an " 'injury is first sustained ... when a party suffers *some form of actionable harm*. The harm need not have reached its fullest manifestation before the statute begins to run.' " *Id.* Again, referring to the *Burns* decision, the Court held that "[a]ctionable harm was held to have accrued when 'some form' of injury was discovered even though the permanent nature of the injury was not known until well after the initial malpractice was first discovered." *Id.* Applying

---

**10.** Although there was only one named respondent, the Consent Order defines "respondents" as Calabrese Construction Co., Inc., and Joseph Calabrese.

these principles, the Court in *BellSouth* found that the widespread contamination documented in 1992 was a further manifestation of the previously discovered asbestos contamination, not a second injury. *Id.*

 To paraphrase the Second Circuit, like the plaintiff in *BellSouth*, plaintiff in this case cannot persuasively argue that his tort claims for remediation costs did not accrue because his first injury was dwarfed by the ultimate loss. *See Id.* at 615. "Under Connecticut law, the accrual of claims does not depend on the magnitude of the injury." *Id.; but see Nemecek v. Town of Ashford,* No. X07CV9870811S, 2000 WL 33115401 (Conn.Super.Dec.14, 2000) (in which the court was unwilling to conclude that plaintiffs's receipt of notification of abnormalities in their drinking water constituted "actionable harm" so as to begin the tolling of the statute of limitations).

Moreover, in this case, plaintiff was well aware of Scovill Manufacturing's dumping activities and prior ownership of the property, and that this parcel had been part of the Scovill Landfill. Plaintiff grew up next to the landfill and watched the Scovill Manufacturing trucks dump waste from the manufacturing operations into the large hole on the property. Additionally, he was aware of McHugh, Sr.'s prior ownership of the property and, in 1994, listed in his bankruptcy proceedings his claim against McHugh for failing to disclose the environmental contamination. All actions by these defendants, on which plaintiff premises his tort claims, took place more than twenty years ago. Although the size

of plaintiff's claims may have increased in magnitude as the State DEP and EPA investigated and undertook a cleanup of the property, the nature of his claims did not change. His "new understanding of the depth of the problem at the Store Avenue Property" did not constitute the discovery of a "new" tort claim. Pl.'s Mem. at 5.

Accordingly, we hold that plaintiff's state-law tort claims against the defendants accrued prior to the filing of his bankruptcy petition and are claims of his bankruptcy estate. Therefore, plaintiff lacks standing to now pursue these claims.

### 2. Count VI—Conn. Gen.Stat. § 22a-452

 In Count VI, plaintiff seeks to recover remediation costs, brought under Conn. Gen.Stat. §§ 22a-452.[11] The Connecticut courts have repeatedly held that § 22a-452 is limited to claims for recoupment of remediation costs from others responsible for the contamination. In order for a plaintiff to be able to bring a claim under § 22a-452, the remediation must have already taken place and the plaintiff must have expended funds for such remediation. *See Blackburn v. Miller-Stephenson Chemical Co.,* No. CV 930314089, 1998 WL 661445, at *10 (Conn.Super.Sept.11, 1998) (citing cases). The reason for this is that liability attaches not upon the act of polluting but upon the act of remediation of that pollution by another. *Cadlerock Properties Joint Venture, L.P. v. Schilberg,* No. CV9969263S, 2001 WL 950233, at

---

11. Conn. Gen.Stat. § 22a-452 provides:

Any person, firm, corporation or municipality, which contains or removes or otherwise mitigates the effects of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous waste resulting from any discharge, spillage, uncontrolled loss, seepage or filtration of such substance or

material or waste shall be entitled to reimbursement from any person, firm, or corporation for the reasonable costs expended for such containment, removal or mitigation . . . resulting from the negligence or other actions of such person, firm, or corporation.

*1 (Conn.Super. July 17, 2001). Thus, plaintiff's claims under § 22a–452 did not accrue until after the remediation had taken place. *Id.* at *3.

Plaintiff is making no claim for the recovery of remediation costs incurred prior to his bankruptcy. Therefore, because this claim relates solely to remediation costs incurred post-petition, we find that any claim plaintiff may have under § 22a–452 did not accrue prior to the commencement of his bankruptcy action and, therefore, was not property of his bankruptcy estate.

### 3. Count VIII—Conn. Gen.Stat. § 22a–16

▮▮▮▮ Plaintiff's eighth count is brought against Saltire and Scovill pursuant to Conn. Gen.Stat. § 22a–16, which is part of the Connecticut Environmental Protection Act. The Act provides that "there is a public trust in the air, water, and other natural resources of the state of Connecticut.... [I]t is in the public interest to provide all persons with an adequate remedy to protect the air, water, and other natural resources from unreasonable pollution, impairment or destruction." Conn. Gen.Stat. § 22a–15. The Act gives any person the right to bring an action for declaratory and equitable relief against pollution.[12] *Manchester Environmental Coalition v. Stockton,* 184 Conn. 51, 56, 441 A.2d 68, 73 (1981). To establish a *prima facie* case under § 22a–16, the plaintiff must establish that the "conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair, or destroy the public trust in the air, water, or other

natural resource of the state...." Conn. Gen.Stat. § 22a–17(a). If the defendant is found liable, the court may grant temporary and permanent equitable relief, or may impose such conditions on the defendant as are required to protect the public trust in the air, water and other natural resources from unreasonable pollution. Conn. Gen.Stat. § 22a–18(a).

We have found no case discussing when a claim under § 22a–16 accrues. However, the statute is clearly directed at the conduct of the defendant, and this Court has previously held that it is more akin to an action in tort than to a breach of contract action. *See Nielsen,* 870 F.Supp. at 443. Thus, it would appear that plaintiff's cause of action under this statute would accrue at the time of defendant acts, or at the very least, when the plaintiff knew or reasonably should have been aware of defendant's actions and the damages caused thereby. In such event, this claim arose prior to plaintiff's bankruptcy petition, and should have been asserted at that time. Therefore, we hold that this claim was part of plaintiff's bankruptcy estate.

### 4. Counts X and XII—Restitution and Indemnity

Plaintiff's tenth and twelfth claims are for restitution and common-law indemnity relating to costs he incurred after 1998. To the extent that these are viable causes of action, which we discuss *infra,* they would not have accrued until after plaintiff's bankruptcy and, therefore, plaintiff would have standing to assert these claims.

---

12. Conn. Gen.Stat. § 22a–16 provides in relevant part:
> ... [A]ny person may maintain an action ... for declaratory and equitable relief against ... any person, ... corporation, ... or other legal entity, acting alone, or in

> combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction ....

### 5. Counts II and XI—Contribution & Declaratory Relief Under CERCLA § 113

Plaintiff has asserted two counts under CERCLA. Count II is a claim for contribution under § 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1),[13] against defendants, as potentially responsible parties, for the response costs incurred by plaintiff. Count XI is a claim for declaratory relief under CERCLA, in which plaintiff asks the Court to declare the rights and obligations of the parties with respect to the cleanup costs that have been and will be incurred for the investigation and remediation of hazardous substance contamination existing at the Store Avenue Property, and for all liabilities, costs, and expenses incurred, or to be incurred, in reimbursing the State of Connecticut.

In this case, because plaintiff's claims relate only to allegedly new contamination discovered in 1998 and remediation costs associated therewith, plaintiff's two causes of action under CERCLA could not have accrued prior to his bankruptcy and are not property of his bankruptcy estate.

### 6. Conclusion as to Claims Arising Prior to Bankruptcy

Accordingly, the Court finds that plaintiff's tort claims asserted in Count III (negligence), Count IV (negligence per se), Count V (reckless misconduct), and Count IX (ultrahazardous activity), and his claim brought under Conn. Gen.Stat. § 22a–16 (Count VIII), arose prior to the commencement of his bankruptcy petition and were property of his bankruptcy estate. Therefore, the Court holds that plaintiff lacks standing to assert these claims, and defendants Scovill and Saltire are entitled to summary judgment on these claims.

### B. Timeliness of Plaintiff's Claims Against the McHugh Estate

In a similar vein, McHugh's Estate asserts that all of plaintiff's causes of action against the McHugh Estate are time-barred by Conn. Gen.Stat. § 45a–375(c),[14] which requires all claims against a dece-

---

**13.** CERCLA § 113(f)(1) states "[a]ny person may seek contribution from any other person who is liable or potentially liable under [CERCLA § 107(a) ]" for response costs. 42 U.S.C. § 9613(f)(1). To resolve § 113(f)(1) contribution claims, "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." *Id.* In contrast to § 113(f)(1), which apportions liability based on equitable considerations and has a three-year statute of limitations, *see* 42 U.S.C. § 9613(g)(3), § 107(a) has a six-year statute of limitations. *See* 42 U.S.C. § 9613(g)(2).

**14.** McHugh's Estate spends a considerable portion of its brief on the issue of whether CERCLA preempts state probate nonclaim statutes. Relying on the Third Circuit case of *Witco Corp. v. Beekhuis,* 38 F.3d 682 (3d Cir. 1994), the defendant argues that state probate nonclaim statutes, like Conn. Gen.Stat. § 45a–375, are not preempted by CERCLA and, in fact, can bar CERCLA claims. Defen-

dant represents that this is the only circuit court decision to have directly addressed this issue and we have found no federal appellate authority to the contrary. *See also U.S. Borax, Inc. v. Forster,* 764 So.2d 24 (Fla.App. 4th Dist.1999), *review denied,* 751 So.2d 1255, 2000 WL 140254 (Fla.), *cert. denied,* 530 U.S. 1229, 120 S.Ct. 2659, 147 L.Ed.2d 273 (2000) (holding that CERCLA did not preempt Florida's nonclaim statute for filing claims against estates); *but see Freudenberg–NOK General Partnership v. Thomopoulos,* No. C91–297L, 1991 WL 325290 (D.N.H. Dec.9, 1991) (reasoning that there was little doubt as to Congress' intent to preempt conflicting state statutes); *Steego Corp. v. Ravenal,* 830 F.Supp. 42 (D.Mass.1993) (emphasizing CERCLA's broad remedial purpose, the court held that CERCLA preempts a state statute where its effect is to limit the liability of a party Congress intended to hold liable for cleanup costs). We find the reasoning of *Witco* persuasive and hold that § 45a–375 is not preempted by CERCLA.

dent's estate, or suits on those claims, to be brought within two years of the date of death of the decedent or the date upon which the relevant statute of limitations would have run, whichever is earlier. McHugh, Sr., died in December, 1993. When plaintiff filed his bankruptcy petition in 1994, he declared that he had a claim against the McHugh Estate for failing to disclose environmental problems associated with the Store Avenue Property. However, he never pursued this claim until 1998, following the commencement of this action, when he filed a notice of claim against the McHugh Estate. As defendant queries, "What gives rise to this posthumous claim's [sic] accrual?" McHugh's Reply Mem. at 1.

Plaintiff responds that the statute cited by defendant applies only to claims arising prior to the date of death and, since his claims did not arise until after the decedent's death, this statute does not bar his claims against the McHugh Estate.[15]

■■■ If plaintiff's claims arose prior to McHugh, Sr.'s death, defendant is correct. All would be time-barred because they were not asserted within two years of the date of death. However, to the extent that

the claims arose after McHugh, Sr.'s death, plaintiff has two years from the date the claim arose or until the statute of limitations expires, whichever is first, to file these claims against the Estate.

Plaintiff has sued McHugh's Estate for contribution under § 113 of CERCLA (Count II), negligence per se (Count IV),[16] reckless misconduct (Count V), reimbursement for remediation costs under Conn. Gen.Stat. § 22a–452 (Count VI), restitution (Count X), and violation of Connecticut's Transfer Act, Conn. Gen.Stat. § 22a–134 (Count XIII). Our analysis of whether these claims arose prior to McHugh, Sr.'s death is the same as that set forth above on the issue of whether they accrued prior to plaintiff's bankruptcy petition. However, there is one additional claim asserted against McHugh's Estate that was not brought against defendants Scovill and Saltire which we must address.

### 1. Count XIII—Transfer Act Claim

■■■ In Count XIII, plaintiff alleges that McHugh, Sr., violated Connecticut's Transfer Act, Conn. Gen.Stat. § 22a–134, *et seq.*, when he failed to comply with the

---

**15.** To the extent that plaintiff is correct that some or all of his claims arose after the death of McHugh, subsection (d) of Conn. Gen.Stat. § 45a–375 would apply, which provides:

With respect to any claim arising after the death of a decedent, no claim may be presented and no suit on such claim may be commenced against the fiduciary, the estate of the decedent, or any creditor or beneficiary of the estate but within (1) two years from the date the claim arose or (2) the date upon which the statute of limitations applicable to such claim, including any period of limitation established pursuant to section 45a–357, would otherwise have expired, whichever shall first occur.

**16.** Defendants also assert that even if this Court were to hold that plaintiff's negligence per se claim is not time-barred, plaintiff has failed to state a claim upon which relief may

be granted because the Connecticut Water Pollution Control Act ("CWPCA"), Conn. Gen. Stat. § 22a–427, *et seq.*, on which this claim is premised, does not support a claim for negligence per se. *Bernbach v. Timex Corp.*, 989 F.Supp. 403, 408 (D.Conn.1996) (Arterton, J.) (holding that the CWPCA does not provide private parties with negligence per se actions for violations of the Act). A review of the relevant caselaw indicates that the courts are split on this issue of whether a negligence per se action may be based on violation of the CWPCA. *See Caprio v. The Upjohn Co.*, 148 F.Supp.2d 168, 172 (D.Conn.2001) (Eginton, J.) (sustaining such an action and citing *French Putnam LLC v. County Environmental Services*, No. CV 980166445S, 2000 WL 1172341, at *10 (Conn.Super. July 21, 2000)). This is an issue we need not decide.

written certification requirements of the Act concerning the discharge of hazardous waste on the Store Avenue Property, when he conveyed his remaining one-half interest in the property to plaintiff in 1986.[17] Plaintiff's claim against McHugh, Sr., arose at the time of the transfer. This is clearly a "claim" for purposes of § 45a–375(c), and must have been brought within two years of McHugh's death or within the statute of limitations period,[18] whichever was earlier. Because this claim was not asserted against McHugh's Estate until 1998, five years after his death, it is time-barred by Conn. Gen.Stat. § 45a–375(c).

### 2. Counts IV and V—Tort Claims

■ With respect to the remaining claims asserted against McHugh's Estate, we conclude that plaintiff's tort claims in Counts IV and V accrued prior to McHugh Sr.'s death and are time-barred, since they were not asserted within two years of McHugh Sr.'s death.[19]

### 3. Environmental Claims & Restitution Claim

■ Plaintiff's environmental claims brought under CERCLA (Counts II and XI), Conn. Gen.Stat. § 22a–452 (Count VI), and for restitution (Count X), relate solely to remediation efforts and expenses

incurred after 1998. All of these causes of action accrued after McHugh's death and the limitations period of subsection (d) rather than subsection (c), Conn. Gen.Stat. § 45a–375, would apply. Thus, with respect to each of these claims, plaintiff must have asserted these claims within two years from the date the claim arose or by the date upon which the applicable statute of limitations would have run, whichever is first. Conn. Gen.Stat. § 45a–375(d). Since all of these claims relate to remediation efforts after 1998, plaintiff's causes of action did not accrue until at least 1998, and the statute of limitations would have begun to run sometime thereafter. This lawsuit was filed in 1998. Accordingly, we hold that these claims are not time-barred by Conn. Gen.Stat. § 45a–375(d).

### 4. Summary as to Claims Barred by § 45a–375(c)

Accordingly, we grant summary judgment in favor of McHugh's Estate on plaintiff's claims in Counts IV, V, and XIII, on the ground that these claims are time-barred by Conn. Gen.Stat. § 45a–375(c).

### III. Failure to State a Claim Upon Which Relief May be Granted

As noted above, defendants have challenged all of plaintiff's claims on the

---

17. Section 22a–134b, Conn. Gen.Stat., provides that

[f]ailure of the transferor to comply with any of the provisions of sections 22a–134 to 22a–134e, inclusive, entitles the transferee to recover damages from the transferor, and renders the transferor of the establishment strictly liable, without regard to fault, for all remediation costs and for all direct and indirect damages.

18. The last transfer of property occurred in 1986, more than seven years before McHugh, Sr.'s death. The parties disagree as to whether there is a statute of limitations applicable to a Transfer Act claim and, if so, which statute of limitations should apply. Regardless of which statute of limitations applies,

plaintiff's Transfer Act claim was clearly not filed within two years of McHugh, Sr.'s death.

19. While there are several statutes of limitations that could apply to plaintiff's tort claims, Conn. Gen.Stat. §§ 52–577, 52–577c(b), 52–584, see Blackburn v. Miller–Stephenson, 1998 WL 661445, at *2; Armotek Industries v. Freedman, 790 F.Supp. 383, 393 (D.Conn. 1992), none of these statutes can extend the life of plaintiff's claims against McHugh's Estate beyond two years after his death. Conn. Gen.Stat. § 45a–375(c). However, even if § 45a–375(c) did not apply, these tort claims would be time-barred under any of the statutes of limitation cited above.

ground that they fail to state a claim upon which relief may be granted. We address herein only the five remaining claims.

### A. Counts II & XI—Contribution and Declaratory Relief Under § 113 of CERCLA

With respect to plaintiff's claims for contribution and declaratory relief under § 113 of CERCLA, defendants argue that plaintiff has failed to state a claim upon which relief may be granted because plaintiff cannot establish that Saltire or Scovill is a potentially responsible party under CERCLA. They assert that plaintiff must present evidence that Saltire or Scovill arranged for the disposal of hazardous substances on the Store Avenue Property or that they were owners or operators of the property at the time when hazardous substances were disposed of on the property. Similarly, McHugh's Estate asserts that there is no evidence that any disposal of hazardous wastes took place during McHugh, Sr.'s ownership of the property. Additionally, they argue that plaintiff has not incurred any response costs and therefore lacks standing to bring a claim under CERCLA.

### 1. Defendants as Potentially Responsible Parties

In order to hold any of the defendants liable under CERCLA, the first element that plaintiff must prove is that they are responsible parties under § 107(a). CERCLA makes four classes of persons liable: (1) present owners and operators of facilities that accepted hazardous substances, (2) past owners and operators of such facilities, (3) generators of hazardous substances, and (4) certain transporters of hazardous substances. 42 U.S.C. § 9607(a). A prior owner or operator of property is a responsible party under CERCLA if he controlled the site at the time of "disposal" of hazardous substances. *ABB Industrial Systems, Inc. v. Prime Technology, Inc.*, 120 F.3d 351, 356 (2d Cir.1997). As the courts have noted, "[t]he Act's broad reach extends liability to all those contributing to—from generation through disposal—the problems caused by hazardous substances." *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992).

In this case, there is sufficient evidence for plaintiff to withstand defendants' summary judgment motions that Saltire, as the successor to Scovill Manufacturing, is a potentially responsible party. Scovill Manufacturing had been dumping materials from its manufacturing operations on the landfill, including the Store Avenue Property, for many years. Defendants argue that the mere fact that Scovill Manufacturing owned the property and disposed of some material there does nothing to support plaintiff's claim that it disposed of *hazardous* substances on the property. Defendants overlook the fact that Scovill Manufacturing had owned this property since 1811 and that the land filling was nearly complete when the property was transferred to McHugh, Sr. The capacitors were unearthed during excavation operations, and from the evidence presented, it is clear that the capacitors were not dumped on the property after the land filling operations had been completed. There is also evidence that capacitors of the type found on the property were used in the factories of Scovill Manufacturing and that Scovill Manufacturing demolished and renovated its facilities and dumped building materials on the property. Although there is no evidence in the record concerning the age of the capacitors that were discovered, they certainly did not pre-date Scovill's ownership of the property. Thus, even if the capacitors did not come from the Scovill Manufacturing plant, it would appear that Scovill Manu-

facturing owned the property at the time they were disposed of at the Scovill Landfill. At a minimum, there are genuine issues of material fact in this regard.

Additionally, we find that there is a genuine issue of material fact as to whether the land filling operations continued after ownership of the property was transferred to McHugh, Sr. Defendant argues that the only evidence that plaintiff has presented concerning when the dumping of hazardous materials took place is the testimony of plaintiff's expert, Jeffrey Heidtman.[20] Heidtman testified that by 1970, the land filling activities had passed the point where the capacitors and other waste materials were found on the Store Avenue Property in 1989. As plaintiff points out, although Heidtman's testimony indicates that by 1970 the land filling had progressed past the point where the capacitors were initially discovered, it does not indicate that all land filling ceased prior to July, 1972, when McHugh, Sr. acquired the property. Furthermore, this is not the only evidence in the record relevant to this issue. The release in the Scovill Foundation/McHugh deed provided for the land filling operations to continue. Plaintiff himself testified that he observed Scovill Manufacturing trucks dumping materials on the Store Avenue Property until 1972 or 1973. Pl.'s Dep. at 100–101. We agree with plaintiff that there are material issues of fact in this regard.

### 2. Plaintiff's Lack of Recoverable Response Costs

Defendants next assert that plaintiff may not bring a contribution action under § 113 of CERCLA because he has not incurred any recoverable response costs. They argue that the Second Circuit requires a CERCLA plaintiff, as part of his *prima facie* case, to demonstrate not only that he incurred costs in responding to a release of hazardous substances, but that the costs incurred and the response actions taken are consistent with the National Oil and Hazardous Substances Pollution Contingency Plan then in effect, citing *Bedford Affiliates v. Sills*, 156 F.3d 416, 427 (2d Cir.1998).

Plaintiff responds that he has incurred expenses in identifying potentially responsible parties. He states that his response costs at a minimum include that portion of his expert's and attorney's fees attributable to identifying potentially responsible parties. He asserts that the "exact amount of [his] attorney and expert fees attributable to identifying potentially responsible parties is a genuine issue of fact," Pl.'s Mem. at 13, but having incurred some response costs, he claims that he is also entitled to a declaratory ruling concerning future costs. *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85,—(2d Cir. 2000). More specifically, he points to the work of his environmental expert, Heidtman, and his attorney, who had to trace the corporate history of the older Scovill entity to identify the "current responsible parties."

As the Second Circuit observed in *Gussack Realty*, 224 F.3d at 91, CERCLA does not provide compensation to a private party for damages resulting from contamination. Instead, CERCLA permits a private party to be reimbursed for all or some of the costs already incurred in response to contamination.[21] *Id.;*

---

**20.** Defendants Scovill and Saltire have moved to strike the affidavit of Heidtman, a matter on which the Court has reserved ruling. However, since defendant McHugh's Estate relies on this affidavit in support of its motion for summary judgment, we will refer to it for that purpose only.

**21.** CERCLA does not define "response costs." It provides that a polluter shall be liable for

*see* 42 U.S.C. § 9613(g)(2) (authorizing suit for recovery of costs pursuant to § 9607 "at any time *after* such costs have been incurred"). CERCLA further permits a declaratory judgment allocating future response costs between potentially responsible parties. *See Id.* ("[T]he court shall enter a declaratory judgment on liability for response costs or damages ... to recover further response costs or damages.") As the Second Circuit explained, sections 107 and 113 "envision that, before suing, CERCLA plaintiffs will spend some money responding to an environmental hazard. They can then go to court and obtain reimbursement for their initial outlays, as well as a declaration that the responsible party will have continuing liability for the cost of finishing the job." *Gussack Realty*, 224 F.3d at 91 (quoting *In re Dant & Russell, Inc.*, 951 F.2d 246, 249–50 (9th Cir.1991)). While compensable costs are broadly defined in the statute, they do not include attorney's fees incurred solely in preparation for litigation unless they "significantly benefited the entire cleanup effort and served a statutory purpose apart from the reallocation of costs." *Key Tronic Corp. v. United States*, 511 U.S. 809, 820, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). Such expenses can include "[t]racking down other responsible ... polluters," which "increases the probability that a cleanup will be effective and get paid for." *Id.* The Supreme Court has ruled that attorney's fees for work performed in identifying potentially responsible persons were recoverable because the work "benefited the entire cleanup effort," and not just the private party's own interests. *Id.* The Supreme Court noted that work performed in identifying other responsible parties could also be performed by engineers, chemists, private investiga-

tors, or other professionals who are not attorneys. *Id.*

▮▮▮ Thus, the issue before us is whether any of the expert's fees or attorney's fees were incurred as a necessary cost of remediating the Store Avenue Property Site and not merely as costs of litigation. Or, as the Second Circuit phrased the issue in *Bedford Affiliates,* 156 F.3d at 431, whether the fees that the plaintiff incurred are "so closely tied to the actual cleanup that those fees qualify as response costs." (Internal quotations omitted).

It is undisputed that plaintiff has not actually incurred any actual clean-up costs since his bankruptcy, and he does not contend otherwise. Indeed, he has testified that he has not been on the property for a number of years. Nevertheless, he has presented evidence in the form of testimony from his expert and his attorney that he did incur certain costs in identifying potentially responsible parties, which the Supreme Court has held, are recoverable. However, in this case, unlike *Key Tronic,* plaintiff's expert did not identify any new potentially responsible parties. Plaintiff had already filed suit against these defendants a year and a half before his expert was retained. Plaintiff's attorney, on the other hand, performed research and investigative work to uncover the identity of the corporate successor(s) to Scovill Manufacturing. These were not fees for work closely tied to the actual cleanup, nor work that would benefit the entire cleanup effort and not just plaintiff's own interests. These were fees for work performed in determining which parties to sue. Thus, we categorize these as litigation expenses, not response costs. We do not believe

---

"any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C.

§ 9607(a)(4)(B). "Respond" and "response" are defined as "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25).

that these were the type of costs that the Supreme Court intended to encompass within the definition of "response costs." *See Sealy Connecticut, Inc. v. Litton Industries, Inc.*, 93 F.Supp.2d 177, 190 (D.Conn.2000); *see also* Lana Knedlik, *Attorneys Fees in Private Cost Recovery Actions Under CERCLA: The Key Tronic Decision*, 44 U. Kan. L.Rev. 365, 393 (1996)(identifying the types of work for which fees could properly be recoverable under CERCLA as including "... designing a removal action, drafting contracts with environmental professionals to perform the removal work, and monitoring the work progress"). Accordingly, we grant defendants' motion for summary judgment on plaintiff's CERCLA claims on the ground that plaintiff has not satisfied the requirement that he have incurred response costs prior to instituting this action for contribution and for declaratory relief.

### B. Count VI—Conn. Gen.Stat. § 22a–452 (Reimbursement of Removal Costs) Against Scovill, Saltire and McHugh

Defendants move for summary judgment on plaintiff's state-law claims under Conn. Gen.Stat. § 22a–452, on statute of limitations grounds and for failure to state a claim upon which relief may be granted.

#### 1. Statute of Limitations

■ As we noted above, a cause of action under § 22a–452 cannot accrue before the remediation occurs. *Cadlerock Properties Joint Venture*, 2001 WL

950233, at *3. Nevertheless, the Supreme Court has suggested that the critical date for statute of limitations purposes is the date the contamination occurred. *See Doty v. Mucci*, 238 Conn. 800, 805, n. 6, 679 A.2d 945, 948 (1996). Thus, the statute of limitations may have run before that remediation occurs.

There has been considerable disagreement among the courts as to the appropriate statute of limitations to apply. In *Nielsen v. Sioux Tools, Inc.*, 870 F.Supp. at 440, this Court held that claims brought under § 22a–452 for reimbursement of costs incurred in the clean-up of environmental contamination were more akin to an action for damages in tort, governed by the three-year tort statute of limitations of Conn. Gen.Stat. § 52–577,[22] or to an action for damages for exposure to a hazardous substance, governed by the two-year discovery limitations period of Conn. Gen. Stat. § 52–577c(b),[23] as opposed to a breach of contract action, governed by a six-year statute of limitations. Although the Court did not decide which statute of limitations applied, it held that under either scenario, the statute of limitations had run, thus barring plaintiff's claims. *Id.; see also Doty v. Mucci*, 238 Conn. at 805, n. 6, 679 A.2d 945 (refusing to decide whether § 52–577c or § 52–577 or § 52–584 is the appropriate statute of limitations for actions under § 22a–452 but holding that the statute of limitations would begin to run from the date of the defendant's negligent acts or the date such negligence reasonably should have been discovered);

---

**22.** Conn. Gen.Stat. § 52–577 states "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

**23.** Conn. Gen.Stat. § 52–577c(b) provides: Notwithstanding the provisions of sections 52–577 and 52–577a, no action to recover damages for personal injury or property damage caused by exposure to a hazardous chemical substance or mixture of hazardous pollutant released into the environment shall be brought but within two years from the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered.

*Cadlerock Properties,* 2001 WL 950233, at *3 (declining to decide which statute of limitations applied to § 22a–452 actions, but holding that any pertinent statute of limitations runs either from the date of the contamination or the date the plaintiff acquired the property with knowledge of its contaminated state). However, other Connecticut state court cases have decisively held that § 52–577c(b) applies to cases involving damages to real property caused by the exposure to hazardous substances. *See Blackburn v. Miller–Stephenson,* 1998 WL 661445, at *9; *Electroformers, Inc. v. Emhart Corp.,* No. 29 78 91, 1993 WL 28904, at *4 (Conn.Super.Jan.29, 1993)(holding that § 52–577c would apply if the facts fit within the statute's definition of "damages caused by exposure to a hazardous substance")..

Defendants argue that, regardless of which statute is applied, plaintiff either had actual knowledge of the environmental contamination or should have known of its existence by July, 1989, and thus, any claim under § 22a–452 is time-barred because plaintiff did not file this action until nine years later. As before, plaintiff would have us find that his "new understanding of the depth of the problem at the Store Avenue Property" constitutes the discovery of a new injury. Pl.'s Mem. at 8.

 We need not reach the issue of which statute of limitations should be applied because we find that under any of the three possible scenarios, the statute of limitations would have run prior to the commencement of this action. Under § 52–577c(b), relating to personal injuries and property damages caused by exposure to a hazardous chemical substance, this § 22a–452 action must have been brought within two years from the date when the injury or damage was discovered or in the exercise of reasonable care should have been discovered. Plaintiff discovered the con-

tamination in 1989. Thus, at the latest, the statute of limitations ran in 1991. Under § 52–577, the catch-all tort limitations period, plaintiff's action was time-barred if it was commenced more than three years from the date of the act or omission complained of. Under this scenario, this action is barred because the acts and omissions complained of occurred up until 1974, or at the very latest, 1986, when the last property transfer occurred. Finally, pursuant to § 52–584, no action to recover damages caused by negligence shall be brought more than two years from the date the injury is sustained, discovered, or reasonably should have been discovered, but in no event later than three years from the date of the offending act or omission. Under this statute, with its outside three-year limitations period running from the date of the offending act, plaintiff's claim would likewise be barred. *See Electroformers, Inc. v. Emhart Corp.,* 1993 WL 28904, at *5–6. Therefore, we hold that plaintiff's § 22a–452 claim against all defendants is time-barred.

### 2. *Failure to State a Claim*

 Alternatively, we find that plaintiff's claim in Count VI for recovery of remediation costs under § 22a–452 fails to state a cause of action under the statute because plaintiff has not proven that he expended any money for cleanup or remediation. As noted above, a reimbursement claim under this section is dependent upon remediation having already taken place. *Knight v. F.L. Roberts & Co.,* 241 Conn. 466, 474, 475, 696 A.2d 1249 (1997). The statute by its very terms is limited to actions by a person "which contains or removes or otherwise mitigates" the effects of hazardous wastes. The clear purpose of this provision is to encourage parties to pay for remediation by providing them with an opportunity to recoup some

of their costs from others who are responsible for the contamination. *Blackburn v. Miller Stephenson,* 1998 WL 661443, at *10. There is no evidence whatsoever that plaintiff has undertaken any remediation of the alleged "newly discovered" contamination. *See Albahary v. City & Town of Bristol,* 963 F.Supp. 150, 156 (D.Conn. 1997). Therefore, he is not entitled to bring an action against defendants for recovery of costs. Accordingly, defendants are entitled to summary judgment on this count of plaintiff's complaint.

### C. Counts X and XII—Restitution and Equitable Indemnity

 Plaintiff's tenth count is for common-law restitution. However, as defendants point out, Connecticut courts do not recognize a state-law cause of action of "restitution." Instead, the courts have held that the appropriate claim is for unjust enrichment with restitution as the proper remedy. *Burns v. Koellmer,* 11 Conn.App. 375, 384, 527 A.2d 1210, 1215 (1987). Whether viewed as a claim for restitution or unjust enrichment, the courts that have addressed such common-law claims in the context of CERCLA actions have held that where the plaintiff had a legal duty to clean-up a contaminated site, recovery based upon unjust enrichment is foreclosed. *Bedford Affiliates,* 156 F.3d at 427; *Nielsen v. Sioux Tools,* 870 F.Supp. at 443 (citing cases). As the Court stated in *Nielsen,* "the DEP ordered [the plaintiff] to take action to remediate the contamination. Thus, just because the DEP chose the plaintiff to do the cleanup work, does not mean that the defendant was enriched." 870 F.Supp. at 443 (internal quotations and citations omitted). Other courts have pointed to the carefully crafted settlement scheme of CERCLA, and have held that CERCLA preempts the state-law remedies of restitution and indemnification. *See Bedford Affiliates,* 156

F.3d at 427. To hold otherwise would allow plaintiffs to bypass the statutory scheme of CERCLA simply by asserting their claims under the state common law. *Id.* Accordingly, we grant summary judgment in favor of defendants on plaintiff's claim for restitution in Count X. Based on this authority, we hold that plaintiff has failed to state a claim upon which relief can be granted in his tenth count.

Plaintiff's twelfth count against Saltire and Scovill is for equitable indemnity for costs incurred by plaintiff in investigating and remediation due to their allegedly improper handling, using, storing, and disposing of hazardous substances at the Store Avenue Property. Plaintiff alleges that he has been required to, and will continue to be so required, to expend substantial amounts for the investigation and remediation of hazardous substance contamination caused by defendants and that he should be indemnified for these expenses. For the same reasons that we found that plaintiff's tenth count for restitution failed to state a claim upon which relief could be granted, we hold that plaintiff's twelfth count for equitable indemnity likewise must fail. We, therefore, grant summary judgment in favor of defendants on plaintiff's twelfth count.

### Conclusion

Accordingly, for the foregoing reasons, the Court grants summary judgment in favor of all defendants on all counts of plaintiff's amended complaint. [Doc. # 41 & # 45].

In light of this Court's ruling on the summary judgment motions, all other pending motions (defendants' motion to exclude the testimony of plaintiff's expert, Jeffrey Heidtman [Doc. # 39], defendants' motion to strike the affidavit of plaintiff's attorney, Mary McQueeney [Doc. # 88],

plaintiff's motion to add a party plaintiff [Doc. # 94], and defendants' motion to hold in abeyance the motion to add a party plaintiff [Doc. # 95]), are denied as moot and will be so endorsed. The Clerk is directed to enter judgment in favor of defendants on all counts of plaintiff's amended complaint.

SO ORDERED.